ALBERTINA SNYDER, Administratrix of the Estate of J. A. SNYDER, Deceased, v. MUTUAL TELEPHONE COMPANY, Appellant.

Electric wires: ACTION FOR DEATH: EVIDENCE. Where there was
1  evidence, in an action against a telephone company for the death of a lineman of a light company from contact with an uninsulated guy wire connecting the poles of the two companies, that defendant's service wire and the guy wire were in contact at the time of the accident, it was competent to show such connection two or three days later, there being no showing of change in condition.

Same: NEGLIGENCE. On the question of a telephone company's
2  negligence in maintaining an uninsulated guy wire connecting with an electric light pole, which is claimed to have been the proximate cause of the death of a lineman of the light company, the evidence is held to require submission of the issue to the jury.

Contributory negligence. On the question of contributory negli-
3  gence of deceased in failing to wear insulated gloves for handling electric wires charged with a dangerous voltage, the evidence is held to present an issue for the jury.

**Same:** INSTRUCTION. On an issue as to the liability of a telephone company for the death of a lineman of a light company, because of contact with an uninsulated guy wire connecting the poles of the two companies, a custom among the employés of the light company in handling electric wires was immaterial, and should not have been submitted as bearing on the question of contributory negligence.

**Same.** Where there is no conflict in the evidence respecting an issue it should not be submitted to the jury.

**Joint tort-feasors:** SETTLEMENT WITH ONE A RELEASE OF ALL: EVIDENCE. A right of action for a tort is indivisible; and a full and complete settlement of the entire claim with one joint tort-feasor extinguishes any right of action for the same wrong against others who might have been proceeded against. Evidence held to show full settlement.

**Same:** INSTRUCTION. An instruction, in an action against one joint tort-feasor, that to avoid liability on the ground of settlement with another it is necessary for defendant to establish a cause of action therefor against the other, is erroneous.

*Appeal from Polk District Court.*— HON. HUGH BRENNAN, Judge.

WEDNESDAY, JULY 3, 1907.

ACTION by plaintiff, as administratrix of the estate of J. A. Snyder, deceased, to recover in behalf of the estate damages for the death of the intestate, caused by an electrical shock while working as a lineman for the Des Moines Edison Light Company, alleged to have resulted by reason of the negligence of defendant in having an uninsulated guy wire connecting the light company's pole on which deceased was working at the time of his death with a pole of the defendant. Verdict and judgment for plaintiff. Defendant appeals.— *Reversed.*

*Hume & Hamilton,* for appellant.

*A. H. McVey, E. H. McVey,* and *P. L. Sever,* for appellee.

McCLAIN, J.— The deceased was one of a squad of employés of the Des Moines Edison Light Company taken.out by the foreman in the afternoon of December 15, 1904, to do repair work on the lines of that company. They proceeded to a pole of the light company, where deceased, who was a lineman, was directed by the foreman to replace with a new one the fuse box on that pole, which had been burned out and damaged beyond repair. One Talbott, as ground man, was directed to assist deceased, and the foreman, with the other men of the squad, went further along the street to attend to other repairs. The pole on which deceased was to do his work was about thirty feet high. About twenty feet from the ground, there was a cross-arm running horizontally north and south, carrying feed wires of the Des Moines Street Railway Company, one of which was south of the pole. About two and one-half feet higher up there was a short cross-arm, supporting below it a box-like apparatus, called a "transformer," or "converter." Two and one-half feet further up was a third cross-arm, carrying electric light wires of the light company, and above this cross-arm was an iron box called a "cutout," or "fuse box," which was the instrument deceased was going up the pole to replace. As to the other cross-arms on the pole and the wires supported by them, nothing need be said, except that the wires were the ordinary electric lighting wires of the light company, save that on the seventh and top cross-arm were borne two wires of the light company, called "primary wires," carrying a voltage of two thousand and eighty volts, while the ordinary electric lighting wires, or secondary wires, carried a voltage of only one hundred and fifteen to two hundred and thirty volts. The two primary wires, running east and west, one being supported on the top cross-arm north of the pole, and the other on the same cross-arm on the south of the pole, were connected by two corresponding feeders, running down the pole to the fuse box, which was double, and from the fuse box to the converter, from which latter instrument

feeders went out to the secondary wires. The purpose of the converter is to change the voltage from that of the primary wires to that of the secondary wires. The voltage carried by the primary wires and by the wires connecting them with the fuse box, and through it with the transformer, rendered the current extremely dangerous to handle, while the smaller voltage of the secondary wires is not necessarily dangerous. But it appears from the evidence that the converter may not only operate in transforming the high voltage of the primary wires to the low voltage of the secondary wires, but that, conversely, if a current passes through the converter from the secondary wires to the primary wires, it is transformed from the low voltage of the former to the high voltage of the latter. This fact is important, for it appears that before the accident happened the feeders between the primary wires and the fuse box had been cut and turned back.

About twenty minutes after deceased went up the fatal pole, Talbott came running to where the other men were at work, and called to them that Snyder had been killed, and they got to the place of the accident as soon as possible. One Clendeniel was the first to arrive, and saw the body of the deceased hanging to the pole by his safety belt, which was fastened above the second cross-arm. Climbing a telegraph pole which was very near to the pole of the light company, he found Snyder to be dead, and in his hand or hands the wire on the south side of the pole leading from the converter to the fuse box, but already cut or disconnected from the fuse box. This wire lay against the breast of deceased, and his clothing was on fire at this place. In the right hand deceased held his pliers, and when Clendeniel disturbed the body the right hand with the pliers dropped to the ground, having been burned off at the wrist. Clendeniel cut the wire which was in the left hand of deceased and in contact with his body, and which at the time he cut it was a live wire. As the body hung suspended by the safety belt, ac-

cording to Clendeniel's testimony, the left leg was thrown over the south feed wire of the railway company, and the left foot was resting upon a guy wire stretched from the pole of the light company to a pole of the defendant company, across the street to the south.

The theory on which the liability of the defendant is predicated is that defendant was negligent in having an un-insulated guy wire connecting the light company's pole with defendant's own pole across the street, with which the foot of the deceased came in contact while he was handling the live wire extending from the converter to the fuse box, thus grounding the light company's circuit of a high voltage, and causing instant death. This guy wire was maintained by the defendant for the purpose of supporting its pole to the south, and a corresponding pole to the north was also connected with the pole of the light company by a similar guy wire. It is not shown whether it is usual to specially insulate such guy wires, but it seems to be conceded by the plaintiff that no such special insulation was necessary in this instance, for evidence was introduced for her tending to show that the guy wires to the south had a contact with the service wire of the defendant company, which was attached to it by means of a piece of scrap wire, so that the guy wire supported the service wire, and plaintiff claims that by means of this connection there was a grounding of the light company's circuit through the body of deceased when his left foot came in contact with the guy wire.

The argument of plaintiff as to the connection between defendant's negligence and the injury to deceased is that deceased, supporting himself on the pole with his spurs and safety belt, handling the light company's live wire of high voltage with safety because of the insulation afforded by the wooden pole, slipped by reason of his spurs losing their support in the wood, and that in his struggle he threw his left foot over the street car service wire, and it came in contact with the guy wire which, owing to its connection with the

service wire, afforded a grounding for the current. It should be said here, however, that there is a square conflict in the evidence as to the position of the left leg of deceased when his body was found. Another witness, who arrived soon after Clendeniel, testified that the legs of deceased were hanging limp down the pole, and that his left foot was not in contact with the guy wire.

This detailed explanation of the conditions and surroundings of the accident has been necessary in order that the bearing of the rulings of the court complained of by appellant and the correctness of the instructions given and refused over appellant's exceptions may be understood. It will be convenient to discuss the various errors which are argued in three groups; the first relating to the negligence of defendant, if any, and its proximate connection with the injury to deceased; the second relating to the question of contributory negligence of deceased; and the third referring to the question whether a certain so-called settlement between the plaintiff and the Des Moines Edison Light Company, to be hereafter more fully described, was such a settlement with a joint tort-feasor as to preclude any recovery against the defendant.

I. Errors are assigned on the admission over appellant's objections of testimony of witnesses with reference to the connection between the guy wire and the service wire of defendant two or three days after the acci-

1. Electric wires: action for death: evidence.

dent; the objection being that the evidence did not relate to the condition at the time of the accident. There was testimony by one witness, however, that at the time of the accident he noticed that the guy wire and the service wire seemed to be in contact, and we think that the more detailed testimony as to the condition two or three days afterward, in the absence of any proof of change in condition in the meantime, was proper to be considered by the jury.

There is complaint, also, of the refusal of the court to

give an instruction asked by appellant that the evidence failed to show the death of intestate to be the direct and

2. SAME: negligence. — approximate result of any act of negligence on its part, and that a verdict should, therefore, be returned for it on this ground. Without going into the details of the evidence, the contention for appellant may be stated to be that the condition of deceased's body when first observed by Clendeniel indicated that the current passing through the body of deceased, causing his death, passed from the converter wire on the south side of the pole, which was held in his left hand, to the other converter wire on the north side of the pole, which deceased must have taken hold of with his pliers, and that, therefore, the contact of the foot of deceased, if any, with defendant's guy wire, had nothing to do with the injury. In support of this theory, counsel rely on evidence tending to show that before the body of deceased was taken down, and when his right hand dropped off, a piece of wire dropped with it, while the piece of wire cut by Clendeniel from the south side of the pole still remained in the left hand of deceased.

It is also contended with much force that a current passing through the body of deceased, from his left hand to his left foot, where it may have come in contact with the guy wire, would have caused the same kind of burning of the left leg and foot as was caused where the current entered the left hand through a heavy woolen mitten or glove; whereas, in fact, the only burning which the testimony for the plaintiff tends to show was in two or three little spots, each about the size of a pea, on the inside of the calf of the left leg, corresponding to the rivets of the spur which was strapped against that leg, and which, as it is contended, carried the current passing from the flesh through a heavy woolen stocking, and through the metal of the spur, which extended under the foot, to the guy wire. The foot of deceased was covered with a heavy rubber shoe, and there is some testimony to the effect that on the bottom of this shoe was some indica-

tion of burning, as though it had come in contact with a hot wire; but it is not contended for plaintiff that the fatal current passed through the rubber shoe; the claim being that it passed through the metal of the spur around the foot. It should also be said that there is direct conflict in the evidence as to the existence on the inside of the calf of the left leg of deceased of anything corresponding to a burn which could have been occasioned by the passing of an electric current from the flesh to the spur. There seems to be much force in these contentions, but we are not prepared to say that under the evidence the jury could not have found that the fatal current took this course. On the whole, we are satisfied to say that the conditions were so complicated and difficult to correctly estimate that the question was properly left for the jury's decision.

II. The chief contention of appellant with reference to contributory negligence is that the deceased should have worn rubber gloves, which were provided by his employer for handling wires charged with a dangerous

3. CONTRIBUTORY NEGLIGENCE.

voltage. The testimony for plaintiff tended to show a custom among the employés not to use such gloves in cold weather, as they prevented the men from using their hands effectively, and that it was regarded as proper to work without gloves, unless they were working on a " bad pole." We think that we would not be justified in saying under the evidence that it was conclusively negligent on the part of deceased to work where he was working, depending on the insulation afforded by the dry pole, without wearing such gloves. If, as in the case of *Junior v. Missouri Electric Light & Power Co.,* 127 Mo. 79 (29 S. W. 988), it appeared that the employé had undertaken to handle live wires through which a current would pass from one to the other, it might well be said to be conclusively negligent in him to omit to use insulating gloves. And the same explanation is applicable to *Hart v. Allegheny County Light Co.,* 201 Pa. 234 (50 Alt.

1010).    But the theory of the plaintiff here is that deceased was not handling at the same time two live wires, but only one, and that the insulation of the pole on which he was supported would have given him sufficient protection had he not by accidentally slipping brought his foot in contact with an uninsulated wire, the danger of which was not known to him, because he had no reason to know that it was grounded.    The case falls, therefore, within the principle announced in *Knowlton v. Des Moines Edison Electric Light Co.,* 117 Iowa, 451, 459.    In *Wagner v. Portland,* 40 Or. 389 (67 Pac. 300), the question was not as to whether the employé was conclusively negligent in not wearing gloves, but as to whether the employer was not negligent in failing to furnish such gloves.

In this connection complaint is made of an instruction in which the jurors were told that they might consider, on the question of contributory negligence, a custom and usage by the employés of the Des Moines Edison Light Company, which had prevailed for a long time and which was known to that company, not to wear gloves except in wet weather.    The knowledge of such a custom on the part of the light company would have no bearing on the question whether deceased was guilty of contributory negligence, so as to defeat a recovery against this defendant.    Such a custom or usage is of importance only where it is contended that there is contributory negligence on the part of the employés in disobeying the rules of the employer.    Under such circumstances, it is competent to show by evidence of a custom known to the employer not to conform to such rules that they have been in effect waived.    So far as this defendant was concerned, it is wholly immaterial what were the rules of the light company, or whether such rules had been waived by it.

4. SAME: instruction.

In the same instruction the court left it to the jury to say whether the deceased was handling live wires of the

Des Moines Edison Light Company charged heavily with currents of electricity, although there was not the slightest conflict in the evidence as to his having come to his death by reason of doing so. The court seems also to have left it to the jury to say whether deceased did in fact wear rubber gloves, although it is conclusively shown that he did not do so. The instruction was erroneous and prejudicial.

5. SAME.

III. Defendant pleaded as an affirmative defense that after the death of plaintiff's intestate, and prior to the commencement of this suit, the Des Moines Edison Light Company paid, and the plaintiff received, a large sum of money, to wit, $1,200 and more, in satisfaction of a claim made by her against the light company on account of the death of her husband, and that by reason of such receipt there was an accord and satisfaction of plaintiff's claim, releasing and exonerating this defendant from any and all liability, if any ever existed, to the plaintiff resulting from the death of her intestate; and in reply plaintiff admitted the receipt from the light company of a sum of money, but averred the same to have been purely a gift or gratuity to her, voluntarily paid, without solicitation, and without any demand or claim by her either personally or as administratrix against said light company, and, further, that the light company was in no way or manner liable for the death of her intestate; that said death was not caused by reason of any act or negligence of the light company or because of any wrong done or committed or suffered to be done or committed by it or its agents, officers, or employés, and that it was not a joint tort-feasor with defendant in connection with the death of deceased, and, further, that at the time of the receipt of said money it was received under the express agreement that it was a gift or gratuity, and that it was accepted as such with the further specific understanding and agreement between the parties to the transaction

6. JOINT TORT FEASORS: settlement with one a release of all: evidence.

that this defendant was not to be released in any way for the damages caused by the wrongful and negligent acts of the defendant resulting in the death of the deceased.

The evidence for the plaintiff on this issue tended to show that the manager of the light company, soon after the death of Snyder, told her that the light company was not to blame, but that he wanted to give her a sum of money to help support the family, and advised her to be appointed administratrix, and told her, if she would release the light company, he would pay her some money. It also appears from plaintiff's own testimony that before receiving any money from the light company she consulted with and was advised by lawyers as to her rights, and that they told her that, if she released the light company, the defendant would also be released, and that she thereupon refused to sign the papers that had been prepared, having been already appointed administratrix, and eventually signed other papers, which as she understood would not have that affect. The papers relating to this alleged settlement which are in evidence in this case are: First, her petition to the probate court by which she was appointed, stating that the only personal property of the decedent at the time of his death was the household goods, and a " claim for damages against a certain company having wires on School street in the city of Des Moines, Iowa, for negligence causing the death of said J. A. Snyder; " that the light company in whose employ decedent was at the time of his death had expressed to her a willingness to pay certain sums of money to her as administratrix, and otherwise, for the benefit of the estate, " all to be accepted by the undersigned individually and as administratrix of said estate in full of any and all claims and demands in favor of the undersigned or the estate of the said J. A. Snyder against the said company, growing out of the death of the said J. A. Snyder; " and she further stated that, in her opinion, it was to the interest of the estate to accept the said proposal, and that she desired to do so, and

asked the court for an order authorizing her to do so, setting aside the money to be paid to her as administratrix for the support of herself and family. Second, an order signed by the judge of the probate court made in response to the petition, reciting that on consideration of plaintiff's petition for leave " to make settlement with the Des Moines Edison Light Company of any and all claims of said estate, if any, against said company growing out of the death of the said J. A. Snyder, it is ordered that said administratrix be, and she is hereby, authorized to make settlement with the said Des Moines Edison Light Company as prayed; and it is further ordered that there be, and is hereby, allowed to said Albertina Snyder as the widow of said deceased, and for the support of herself and children, the sum of $429," which was the amount to be paid in cash to plaintiff. Third, a receipt signed by plaintiff individually and as administratrix for $969 in various items specified, " all in full payment, settlement, and satisfaction of any and all claims and demands of the undersigned, Albertina Snyder, and of the estate of J. A. Snyder, deceased, and the said Albertina Snyder as administratrix thereof, against the said Des Moines Edison Light Company on account of the death of J. A. Snyder, including any and all claims against said company for damages to the said estate and the undersigned growing out of the death of the said J. A. Snyder."

We think it wholly immaterial whether plaintiff had made a claim against the Light Company on account of the death of her husband, or whether the manager of that company first approached her and suggested that he would pay her some money. The question is whether plaintiff received from the Light Company by voluntary settlement full compensation of any demand which she could have made or might have had against the Light Company for this same tort. To constitute a settlement with some one joint tortfeasor such as to release another who is sought to be held liable for the same tort, it must be shown that the settlement

was of the entire claim against the one with whom the settlement is made. But, when it appears that there has been such settlement, supported by a valuable consideration, the entire right of action against any other person who might have been proceeded against for the same injury is extinguished; for the right of action for tort is indivisible, and one satisfaction extinguishes the entire demand. *Ryan v. Becker,* 136 Iowa, —— (111 N. W. 426); *Turner v. Hitchcock,* 20 Iowa, 310; *Metz v. Soule,* 40 Iowa, 236; *Bell v. Perry,* 43 Iowa, 368; *Putney v. O'Brien,* 53 Iowa, 117, 127; *Miller v. Beck,* 108 Iowa, 575, 582.

Without doubt, there may be technical releases or covenants not to sue, which, however effectual in favor of the person thus relieved from liability, are not conclusive as to another charged with the same wrong; it appearing that the person thus released was in no way liable. *Kentucky, etc., Bridge Co. v. Hall,* 125 Ind. 220 (25 N. E. 219); *Gilbert v. Finch,* 173 N. Y. 455 (66 N. E. 133, 61 L. R. A. 807, 93 Am. St. Rep. 623); *Miller v. Beck,* 108 Iowa, 575. It has also been held that in a settlement with one tortfeasor the right of action against another may be reserved. *Carey v. Bilby,* 129 Fed. 203 (63 C. C. A. 361); *O'Shea v. New York, C. & St. L. R. Co.,* 105 Fed. 559 (44 C. C. A. 601); *Gilbert v. Finch,* 173 N. Y. 455 (66 N. E. 133, 61 L. R. A. 807, 93 Am. St. Rep. 623); *Missouri, K. & T. R. Co. v. McWherter,* 59 Kan. 345 (53 Pac. 135). It is also true that a mere gratuity paid by one as to whom no claim is asserted and no liability contemplated will not be a satisfaction of a claim against the one liable for an injury. *Sieber v. Amunson,* 78 Wis. 679 (47 N. W. 1126); *Wagner v. Union Stockyards & Transit Co.,* 41 Ill. App. 408. It has likewise been held that the settlement of a suit by the payment of costs, or the acceptance of a sum given in consideration of its dismissal against one who has been sued for a wrong, will not release another liable for the same wrong. *Sloan v. Herrick,* 49 Vt. 327. But, as we have recently

said in *Ryan v. Becker,* 136 Iowa, —— (111 N. W. 426), this exception covers only cases where a release is claimed without reference to the question of satisfaction in fact.

There is no occasion here, however, to discuss more fully these qualifications of or exceptions to the general rule. The plaintiff entered into a voluntary settlement for a substantial consideration with the light company, in which she expressly recited the receipt from said company of the sum paid by it in full of all claims against it for damages to the estate on account of the death of her intestate, thereby assuming that there was some claim of liability against said company, and agreeing that this claim was extinguished. While she recites in her petition to the probate court that there is a claim in favor of the estate against " a certain company," thus leaving it uncertain whether the light company or this defendant is referred to, she nowhere reserves any claim against defendant from the settlement, and this is a material matter, for it would in the nature of things affect the amount for which she would be willing to release the light company if she was insisting that the amount received was only in partial satisfaction of the entire injury.

The court instructed the jury that there was no direct evidence of wrongdoing on the part of the Des Moines Edison Light Company which contributed to or caused the death of intestate, but that it was for them to consider as a matter of fact whether the light company and the defendant were both jointly liable for the accident which caused the death of plaintiff's intestate, and that, if from all the facts and circumstances they should find that no claim was made against the light company and the light company was not a joint wrongdoer with the defendant, then the receipt given to the light company was not a release of the defendant; but that if they should find that there was a joint liability and both were wrongdoers in causing the death of intestate, and that the plaintiff settled the claim for the damages on account of her husband's death

7. SAME: instruction.

with the light company, then and in that case she could not recover.

The vice of this instruction is that it requires the defendant to show as an affirmative fact, in order to sustain the settlement pleaded by it, that the light company was as a matter of law and fact liable for the injury. In other words, it requires the defendant to make out against the light company just such a cause of action as plaintiff would have been required to make out if she had sued the light company for the injury. Clearly this is not the law. The question is whether plaintiff had received satisfaction from another of a claim for the same wrong — whether the injury to the plaintiff had been satisfied. She should not have two satisfactions. To sustain the rule announced in the instruction, it would be necessary to hold that although the plaintiff had sued the light company and recovered judgment against it, which judgment had been satisfied, she could then have sued this defendant and recovered another satisfaction if the jury in the second case had found that notwithstanding the judgment against the light company, it was as a matter of fact not liable for the injury, for a judgment against one party is of no binding effect in an action against another. This question is practically determined by what is said in *Miller v. Beck,* 108 Iowa, 575, 582, where this language is used: " As we have seen, it is entirely immaterial that the one from whom satisfaction was demanded and received was not liable for the entire damage. A satisfaction by whomsoever made, if accepted as such, is a bar to further proceedings on the same cause of action." Whether or not this language was *dictum* in the case in which it was used need not be now discussed, for it is, as we think, a sound statement of the law. *Leddy v. Barney,* 139 Mass. 394 (2 N. E. 107); *Seither v. Philadelphia Traction Co.,* 125 Pa. 397 (17 Atl. 338, 4 L. R. A. 54, 11 Am. St. Rep. 905); *Hartigan v. Dickson,* 81 Minn. 284 (83 N. W. 1091); *Tompkins v. Clay Street R. Co.,* 66 Cal. 163 (4 Pac. 1165).

Much is said in argument on either side as to whether the testimony of plaintiff was admissible as contradicting the receipt given to the light company expressly releasing it from liability, but we think it unnecessary to go into this discussion. There is nothing in her testimony which tends to prove any final agreement with the light company other than that indicated by the instrument, subsequently signed by her. A mere desire on her part that the defendant should not be released in that settlement, or the belief that such settlement would not have the legal effect of releasing the defendant, cannot change the result of the settlement actually made.

For the errors pointed out, the judgment of the trial court is *reversed*.