ELMER STEARNS, Appellant, v. CHICAGO, ROCK ISLAND &
PACIFIC RAILWAY Co., Appellee.

Railroads: PERSONAL INJURY: SETTLEMENT: FRAUD. A compromise
1 and settlement for a personal injury which is obtained by fraud
and misrepresentation and at a time when the injured party was
sorely sick in mind and body is void.

Same: MOVEMENT OF CARS: BRAKES: STATUTES: EVIDENCE OF CUS-
2 TOM. Where a railway engine is being used for the purpose of
switching or spotting cars, the statutes of this state do not require
as a matter of law that the automatic brakes upon the cars be
coupled up so as to be operated by the engine. The federal stat-
utes, however, requiring that a certain percentage of cars in a
train operated by power brakes shall be coupled and the brakes
operated from the engine, applies to cars being moved by an inter-
state railway along its main track from the yards of the company .
to the freight house some distance away, regardless of whether
any article of interstate commerce is being moved; and this pro-
vision of the law cannot be avoided by proof of a contrary custom.

Same: PERSONAL INJURY: CONTRIBUTORY NEGLIGENCE: EVIDENCE. The
3 evidence in this action by plaintiff, the conductor of a switch train
belonging to one company, against another company for injuries
caused by collision at a crossing, is held to show that plaintiff
violated the law requiring the use of power brakes and that he
failed to stop his train before attempting to make a crossing, which,
among other facts contributed to his injury.

Evidence of party to suit: CONCLUSIVENESS. While a party is not con-
4 cluded by the testimony of his own witness, but may show the
facts although it may discredit the witness, he is bound by his
own testimony which he in no manner seeks to change or correct
during the trial.

*Appeal from Linn District Court.*—HON. W. N. TREICHLER,
Judge.

MONDAY, JUNE 29, 1914.

ACTION at law to recover damages for injuries received
by plaintiff, an employee of the Chicago, Milwaukee & St.
Paul Railroad Company, due to a collision between a train
on its road, with one operated by defendant on its line, at a
crossing of the two within the city of Cedar Rapids. The case
was tried to a jury, and at the conclusion of plaintiff's testi-
mony the trial court directed a verdict for the defendant,
based largely upon the thought that plaintiff was guilty of
contributory negligence as a matter of law. Plaintiff appeals.
—*Affirmed.*

*E. A. Johnson* and *Rickel & Dennis,* for appellant.

*F. W. Sargent* and *R. J. Bannister* and *Grimm & Trewin,*
for appellee.

DEEMER, J.—The Chicago, Milwaukee & St. Paul Railway
Company (which we shall hereafter call the Milwaukee Com-
pany) and the defendant, the Chicago, Rock Island & Pacific
Railway Company (which we shall call the Rock Island),
have main lines of track running to and through the city
of Cedar Rapids, Iowa. They cross each other at or near the
junction of Third street and Ninth avenue in that city, as
shown by a plat introduced by plaintiff, which we here attach.

Plaintiff was employed by the Milwaukee Company as a
switchman in its yards at Cedar Rapids, and on the day of
the accident, which was on June 17, 1910, he was in control
and charge of a crew consisting of himself, an engineer, fire-
man, and two other helpers, engaged in switching a refrigera-
tor car to the freighthouse of his company, which was located
some distance west of the Rock Island crossing. This car was
attached to the tender of the engine, and was being pushed

ahead of the engine; the engine itself running backward. Plaintiff had mounted the car, and was sitting on the right-hand side farthest away from the engine, taking this position, as he says, to keep a lookout. The engineer and fireman were depending upon signals either from the plaintiff or his helpers, one of whom was on the ladder at the forward end of the car, and the other on the other end of the car next to the tender of the engine. The fireman being on the left-hand side of the engine as it was being backed, would naturally, and did, in fact, get the signals made by plaintiff, who was in best position to see and observe anything dangerous.

As will be observed from the plat, the Milwaukee train, in coming from the east or northeast toward the crossing of the Rock Island, approached the said crossing upon rather a sharp curve, the degree of which is not given, but which is approximately shown on the plat. On the east side of Third street and the north side of Ninth avenue, and at the northeast corner of the junction of the two streets, is a store building; the location and approximate height thereof being shown on the plat. This building obstructed the view of a train coming from the north on the Rock Island tracks. The different ranges of vision are also approximately shown by the plat.

As plaintiff was approaching the crossing, he being, in fact, in charge of the train, a Rock Island train was also approaching the same crossing from the north. This train was made up of a switch engine and eight or nine cars, which were being switched back and forth in the yards. The switch engine was attached to the cars at the head end, and it also was being run backward, and, the testimony tends to show, at a great rate of speed, just prior to the accident; some of the witnesses say at the rate of twenty or twenty-five miles per hour. The testimony also tends to show that there was no warning given by the engineer or fireman of the Rock Island engine, of its approach to the crossing, by the sounding of the whistle or the ringing of a bell. There was an ordinance of

the city providing that no engine or train should be run within the limits of the city at a greater speed than eight miles per hour, and there is also a statute of the state providing that:

All trains run upon any railroad in this state which intersects or crosses any other railroad upon the same level shall be brought to a full stop at a distance of not less than two hundred nor more than eight hundred feet from the point of intersection or crossing, before such intersection or crossing is passed, except as otherwise provided in this chapter. Any engineer violating the provisions of this section shall forfeit one hundred dollars for each offense, to be recovered in an action in the name of the state for the benefit of the school fund, and the corporation on whose road such offense is committed shall forfeit the sum of two hundred dollars for each offense, to be recovered in like manner.

There is ample testimony tending to show that the employees of the Rock Island Company were violating both the ordinance and the statute before quoted, and enough to take the case to the jury upon the question of defendant's negligence, independent of statute, in approaching the crossing at such a rapid rate of speed without giving any warnings or signals. See, also, section 2072 of the Code with reference to signals.

We may say in this connection that, notwithstanding some erroneous rulings, which might have had some bearing on the question of defendant's negligence, there was enough without this testimony to show defendant's negligence, and we do not consider these rulings at this time for that reason. This eliminates, at least for the time being, several of the points made for the plaintiff in the briefs filed by his counsel.

II. As we view it, there are but two debatable propositions in the case, although there are some incidental questions arising on each of these propositions. Some of the agents of the Milwaukee Company negotiated a settlement with the plaintiff on the basis of the payment of $500 by the Milwaukee Company and a like amount by the Rock Island. The Milwaukee Com-

1. RAILROADS: personal injury: settlement: fraud.

pany paid the $500, but the Rock Island never paid the amount which the Milwaukee agents said it would. There was no claim made against the Milwaukee Company by the plaintiff, and no negligence on its part appears in the record.

As we understand it, it undertook the settlement pursuant to a rule or understanding between the two companies, to the effect that each would look after injuries to its own employees, at least in the city of Cedar Rapids, where injuries resulted to them as a result of the negligence of either. Whether or not this rule was known to plaintiff, we are not fully advised, but, assuming that it was, plaintiff agreed to settle on the basis of $1,000, which has not been paid him, and he has not had satisfaction for his injuries. Whether or not in such circumstances the Rock Island Company, which is solely responsible for the injuries, may rely upon the payment made by the Milwaukee Company under the arrangement between the two companies, and insist that plaintiff cannot recover in this action without refunding to the Milwaukee Company the amount paid him by that company, is a question of much doubt, but one which need not now be decided; because in any event, under the testimony adduced, a jury would have been justified in finding that the settlement or compromise was made through the fraud and misrepresentations of the agents of the company negotiating it; plaintiff at the time being sorely sick in mind and body. See *Kelly v. R. R. Co.*, 138 Iowa, 273, 280; *Coles v. R. R.*, 124 Iowa, 48; *Kelty v. Mc-Peake*, 143 Iowa, 567.

That there was no settlement and payment such as to satisfy the claim, see *Snyder v. Tel. Co.*, 135 Iowa, 215; *Miller v. Beck & Co.*, 108 Iowa, 575; *Turner v. Hitchcock*, 20 Iowa, 310; *Bell v. Perry*, 43 Iowa, 372.

III. As bearing upon the other question of plaintiff's contributory negligence, we quote, in addition to sections 2072 and 2973 of the Code already referred to, or set out, the following:

Code Section 2082: No corporation, company or person operating a line of railroad in the state shall run any train of cars that shall not have therein a sufficient number of cars with some kind of efficient automatic or power brake to enable the engineer to control the train without requiring brakemen to go between the ends or on the top of the cars to use the handbrake.

And also the following federal statute, taken from 32 Stat. at Large, 943, section 2, reading as follows:

Whenever, as provided in said act, any train is operated with power or train brakes, not less than fifty per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said fifty per centum shall have their brakes so used and operated; and, to more fully carry into effect the objects of said act, the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid; and failure to comply with any such requirement of the Interstate Commerce Commission shall be subject to the like penalty as failure to comply with any requirement of this section.

Pursuant to this section the Interstate Commerce Commission, on June 6, 1910, promulgated the following order:

It is ordered that on and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, shall have their brakes used and operated by not less than 85% of the cars of such train the engineer of the locomotive drawing such train, and all power-brake cars in every such train which are associated together with the 85% shall have their brakes so used and operated.

It is contended for appellee that plaintiff, who was in charge of the Milwaukee train and responsible for its make-

up, management, and control, he being at that time the foreman or conductor thereof, was guilty of a violation of each and all of these statutes and orders; that some, if not all, of these violations contributed to his injury; and that he cannot, for this reason, recover. It is also claimed that, independent of these statutes, he was guilty of contributory negligence, in that he did not exercise proper care in looking out for the Rock Island train; that if he had done so, and properly used the means at hand, or as the statute requires, he could have stopped his train and avoided the injury.

In view of these claims it is necessary to state more of the record. The refrigerator car in the Milwaukee train was properly equipped with air brakes, having a shoe to each of the eight wheels of the car, but these brakes were not connected up with the engine and, of course, were useless. There is some conflict in the testimony as to whether the Milwaukee train stopped before proceeding over the crossing, as the statute requires. As to this we shall have more to say hereafter.

It also appears without dispute that the Milwaukee train was stopped before the collision, and that a corner of the tender of the Rock Island engine struck the drawbar of the refrigerator car, so that, if the Milwaukee engine had stopped a few inches before it did, the accident would not have occurred.

Going back now to the statutes of the state, we may remark that our own statute as to the coupling of the air lines does not require all or any given percentage of the cars in a train to be coupled. In construing this section we held (*Carter v. Sioux City*, 160 Iowa, 78) that it is not necessary, as a matter of law, to have any of the cars connected up, especially where the engine is spotting cars. So that it cannot be said that plaintiff, as a matter of law, violated our statute in not having the air connected up on the car. The federal statute and the order of the Interstate Commerce Commis-

2. SAME: movement of cars: brakes: statutes: evidence of custom.

sion do make an absolute rule upon this subject and requires a certain percentage of the cars to be coupled. Each of these trains was upon a main line, and not upon side or passing tracks, and the Rock Island Company was engaged in switching within its own yards. The Milwaukee was not in its own freightyards, which were some distance westward of the point of collision, and the car was being taken to these yards, from what are known as its "east yards" nearly a mile away.

That the federal statute was and is applicable to the case, although there is no showing that at the particular time any object was being moved in interstate commerce, is held in the recent case of *Southern R. R. v. U. S.,* 222 U. S. 20 (32 Sup. Ct. 2, 56 L. Ed. 72). No matter what our views upon this question, that decision is final and controlling.

But appellee's counsel say that it was the custom of the Milwaukee Company not to observe this requirement, and they made some proof in this respect, while other testimony to the same effect was rejected. This testimony, they think, was inadmissible, as tending to relieve plaintiff of his non-observance of the law, even though he had knowledge of the custom. The provisions of this law was made for his own as well as for the safety of others, and he could not, as we think, neglect the observance of this law, although it was customary for others in the employ of the Milwaukee Company, as well as himself, to disobey.

A statute of this kind cannot be avoided by proof of custom. Surely it would be no defense to criminal liability, and, as a rule, one who violates a criminal law made for his own safety is himself guilty of negligence.

The only other point made is that there is no requirement of law that trains and engines engaged in switching should be so equipped and coupled. In other words, it is insisted that the courts should ingraft an exception on the law to this extent at least. We are not disposed at this time to do more than say that we shall not, in any event, acknowledge any exception, unless it be to trains and engines actually

engaged in switching or spotting cars within their own yards, and not to trains on main lines entering yards, which are being used to take cars from some other place outside the yards to be left there, no matter for what purpose.

A railway crossing is always an exceedingly dangerous point, and there is no place where there is more necessity for a full equipment of brakes, under the interstate commerce rule,

3. SAME: personal injury: contributory negligence: evidence.

than at such crossings. Under the testimony the car was being taken from the Milwaukee "east yard" to the freighthouse, they being, approximately, a mile apart, and the train was required to cross a number of railway and street crossings, in addition to the one in question. We are constrained to hold that plaintiff, having charge of the make-up of this particular train, violated the statute, and that this, with other facts which we shall presently relate, was one of the causes which contributed to his injury.

We are not to be understood as stating that the Milwaukee Company did not give the usual and statutory signals for the crossing; but whether it observed the statute requiring the stopping of the train is one of the matters in dispute. The singular thing is that every man connected with the operation of the Milwaukee train who gave testimony, and this included all but one, said that the train did not come to a full stop, and plaintiff himself testified:

On the day of my accident we had been to the east yard and got a car of merchandise, and were going to the freighthouse with the car. We stopped at the Northwestern crossing for the double switch, and had got down to one hundred fifty to two hundred feet of the Milwaukee crossing. We stopped for that, and whistled and worked a little steam, just enough to start up, and then drifted around the curve. We got in by the corner of the Star Grocery, and I was sitting on the side of the car with my feet hanging down over the ladder. . . . I saw the Rock Island cars coming down the track, and the engineer was not looking. The Rock Island engineer was looking towards the crew that he was working with. He

was sitting on the right-hand side of the engine, with his head out looking towards the switchman. When I first saw·him he was working steam and running twelve or fifteen miles an hour. When I saw the Rock Island engineer was not going to stop his train, I gave our engineer the signal to stop. I called to the Rock Island engineer at the same time. I gave our engineer the signal to stop. I then jumped up and started as quick as I could to the head end of the tender. . . . Then, when I started to get off, I started for the tender of our engine as fast as I could, and just before I got there the Rock Island engine caught the drawbar on the car on which I was on and tipped the car and throwed me off on the pavement. When the Rock Island engine hit us our car was standing still. When our car came around Vondracek's grocery store we weren't going more than five or six miles an hour on the outside. . .. . The Rock Island train was one hundred and fifty or two hundred feet from the Milwaukee tracks when I first saw it. I would not say positively that it was this distance, but somewhere along there.

There is an alley north of the building where Vondracek's store is. We came to a stop when we got in the vicinity of that point on the exhibit marked 'about.' We were just merely moving. We didn't come to a dead stop. Our engine then made two or three exhausts, and we drifted down the grade. I was sitting on the extreme front and looking in the direction of the Rock Island tracks. When I got to the north line of Ninth avenue I could see across Third street clear to the river—about three blocks and a half to the bridge. As we got further around the buildings, I could see further up the Rock Island tracks to the north. The Rock Island train was about one hundred and fifty to two hundred feet from the crossing when I first discovered them. I was always on the lookout coming around there. I was on the northwest corner of the car for the purpose of acting as lookout. I was watching the Rock Island tracks. I was keeping a lookout for trains. I was between the stop board and the crossing right in here some place (indicating on plaintiff's Exhibit 1) when I first discovered the Rock Island switch engine. I don't think that part of the car on which I was riding had passed over the east line of Third street when I first saw the Rock Island tank. I was pretty close to Third street when I first noticed the Rock Island train. They were one hundred and fifty to two

hundred feet north of the intersection of these two railroads. They were going ten, twelve, or fifteen miles an hour. We are going about four or five miles, and maybe six miles, an hour when I first discovered them. The engineer's head and shoulders were out of the cab window, and he was looking at the string of cars back of him. He continued in that position all the time I saw him. I gave the stop signal as soon as I saw the Rock Island train coming. The brakes were applied. I gave the stop signal while I was still sitting. I gave a full emergency stop signal. That meant to all the men that there was trouble ahead and that they must stop as soon as possible. I did not make any effort to get down the ladder; there was a man there. I got up and started back over the car to jump onto the tank of the engine. The car, with drawbars included, is something like forty feet. The drawbars are something like eighteen inches to two feet long. I was not sitting with my feet over the end of the car, but I was sitting with my feet over the side of the car. I was within four feet from the east end of the car when they hit it. From the time I started for the east end of the car I never looked back towards the Rock Island engine.

True the latter part of this testimony was given on cross-examination, but the witness was not asked to correct or change it on re-examination or otherwise. The other witnesses upon the train testified that it was not stopped, but slowed down to from two to four miles an hour, and then started up to a greater speed, the rate of which was not fixed. These were all plaintiff's witnesses. There were two bystanders who witnessed the accident, who testified that the Milwaukee train came to a full stop, and that when it started up again its speed did not exceed three or four miles an hour.

We may as well, in this connection, refer to some of the other testimony in the case, that the facts may be fully recited before going to the arguments with reference to the different features. Plaintiff testified that when he first saw the Rock Island train his train was moving at the rate of five or six miles per hour, and that the Rock Island was going at from

ten to fifteen; that when he first saw the Rock Island train it was from one hundred and fifty to two hundred feet from the crossing; and that his train must have been approximately one hundred and ten feet from the crossing. According to the plat, and the oral testimony offered in connection therewith, plaintiff, when one hundred and twenty feet from the crossing, could have seen the Rock Island train two hundred and ten feet therefrom, and when one hundred and thirty-six feet from the crossing could have seen the Rock Island for seventy-nine feet. He testified that he saw it from one hundred and fifty to two hundred feet of the crossing, and at that time he must have been, as we have said, at least one hundred and ten feet from the crossing. The day was damp and dark, and the rails slippery, and the engineer and fireman of the Milwaukee train did all they could to stop the train after receiving the emergency signal. On account of the weather conditions, the wheels slipped on the rails, and it was somewhat difficult to stop the train; but the relative speed at which the two trains were running must have been at least as two to one when the danger was first observed.

There is no definite testimony as to whether the Rock Island engineer at any time slackened the speed of his train, or that he was aware that a collision was impending. Going back now to some legal questions:

It is contended for appellant that, although he himself testified, both on direct and cross-examination, that his train did not stop before reaching the crossing, yet he is not concluded by the statements, and may show the **4. EVIDENCE OF PARTY TO SUIT: conclusiveness.** fact to be otherwise. This proposition is disputed by appellee's counsel. They insist that plaintiff is concluded by his own testimony. It is not a question of impeachment of witnesses, nor necessarily of the effect of admissions out of court. Of course plaintiff could not impeach himself; nor would his admissions out of court, shown upon the trial, conclude him. And it is equally well settled that one is not concluded by what a witness in his

behalf testifies.   Notwithstanding he may prove the truth, although such proof inferentially discredits his own witnesses.

These propositions are all well settled.  *Collins v. Express Co.,* 140 Iowa, 304; *State v. Beede,* 151 Iowa, 701; *Hall v. Manson,* 99 Iowa, 698; *O'Neil v. Adams,* 144 Iowa, 385; *Clapp v. Peck,* 55 Iowa, 270; *Rudd v. Dewey,* 139 Iowa, 528; *Smith v. Utesch,* 85 Iowa, 381.

The question really is: Is plaintiff's own testimony conclusive against himself?   This is rather a nice question, which does not seem to have been definitely decided; or, better stated perhaps, discussed in any of our previous cases.   There are intimations in some of them that a party is concluded thereby unless he, in some manner, changes or offers to change his testimony on the trial.   See *Hinkson v. Morrison,* 47 Iowa, 167; *Thornburg v. Doolittle,* 148 Iowa, 530; *Reynolds v. Pray,* 148 Iowa, 213.

Of course a party is bound by statements or agreements made by his counsel; but this does not quite reach the proposition here involved.   In support of the last rule see *Yoder v. Engelbert,* 155 Iowa, 515; *May v. Wilson,* 164 Mich. 26 (138 N. W. 1084, Ann. Cas. 1912-b, 654).

It must be remembered in this connection that we are not now dealing with admissions made by a party out of court, or upon a former hearing of a case in another court, or with what may strictly be called admissions, which are generally inconclusive.   The point here is: Is a party to a suit bound by his own testimony, which he does not, at any time, seek to correct or change during the course of the trial?   He is bound by statements of his counsel; by admissions in pleadings not withdrawn or superseded; and it seems to us he should also be bound by his own testimony which he nowhere attempts. to change.   Such is the holding in *Feary v. R. R. Co.,* 162 Mo. 75 (62 S. W. 452); 1 Greenleaf on Evidence (16th Ed.) section 170; *Rodney v. R. R.,* 127 Mo. 676 (28 S. W. 887, 30 S. W. 150); *Markley v. W. U. Tel. Co.,* 159 Iowa, 557; *Hawes v. Marchant,* 1 Curtis (C. C.) 136, Fed. Cas. No. 6,240.   See *contra,*

*Frost v. R. R. Co.*, 165 Cal. 365 (132 Pac. 442); *Bird v. Railroad*, 11 App. Div. 134 (42 N. Y. Supp. 888); *Cafferata v. Cafferata*, 23 Mo. 235; *Norris v. St. L., I. M. & S. Ry. Co.*, 239 Mo. 695 (144 S. W. 783). If this be the true rule, then it is apparent that plaintiff did not stop his train as required by statute, and that the momentum at which it was going was such that he could not stop it in order to avoid the collision. In this connection failure to couple the air on the car with the engine was also a contributory feature, for it does not require proof to demonstrate that with all the brakes set on the car the collision could not have occurred. Aside from this, however, it is clear that the accident could not have happened in the manner plaintiff says it did. The Rock Island train, although going at least twice as fast as the Milwaukee, did not pass over 150 feet, while the Milwaukee, with the brakes on the engine set, going at no time faster than 5 or 6 miles an hour, passed over 113 feet of track; and yet, according to the record, the Milwaukee first reached the crossing.

It must be that both trains were running at a speed in excess of the ordinance rate, or that plaintiff did not, through his own want of care, see the Rock Island train as soon as he should. If his testimony as to when he saw the train is to be believed, and they were each running at the speed he says, the Rock Island would have been over the crossing long before the Milwaukee reached it. These physical and mathematical facts cannot be gainsaid. They are easily demonstrable, and, it seems, in view of the other facts in the record, conclusive.

The case turns upon plaintiff's violation of the two statutes referred to, and upon his failure to look for or see the Rock Island train, as he should. It was on this last proposition that the trial court directed the verdict, as we understand it. Under the record, it seems to us that a verdict for the plaintiff should have been set aside had one been returned on the testimony adduced, and for that reason there is no reversible error.

The judgment must therefore be, and it is, *Affirmed.* All the Justices concur.