SNITTJER GRAIN Co., appellant, v. HERMAN KOCH et al., appellees.

No. 48730.

(Reported in 71 N.W.2d 29)

June 7, 1955.

B. E. Hunter, of Reinbeck, and Merle L. Royce, of Marshall-town, for appellant.

DeWolf, Goodman & Huisman, of Grundy Center, for appellees.

SMITH, J.—Although not so pleaded nor explained of record the Snittjer Grain Co. is conceded (in oral argument) to be a mere trade name under which John Snittjer operates a grain elevator at Wellsburg, Iowa. No point about it is raised by defendants, however, and we shall treat and refer to him as plaintiff.

He alleges that on or about December 11, 1951, defendants asked him to order a Model 25, American All Crop Dryer for them and orally agreed to pay him the $1515 purchase price and to accept delivery at Crystal Lake, Illinois. He alleges delivery was so made to them, that he has paid for the machine and demanded payment from them.

Defendants deny practically every allegation and "affirmatively state that defendants asked no order, nor made no order * * * but (merely) inquired of a machine 'that would do the work' of drying cribbed ear corn." They also pleaded some affirmative defenses not set out in the record nor deemed pertinent to the appeal.

Notwithstanding their pleaded denial defendant Williams, being put on the witness stand by plaintiff, testified: "I am one of the defendants. We took delivery and possession of a Model 25, American All Crop Dryer at Crystal Lake, Illinois, on January 11, 1952, and had it trucked to Wellsburg, Iowa." He was not cross-examined by defendants. His testimony stands undenied.

The testimony of plaintiff and his office manager, John Riekena, is to the effect that "about two weeks prior to December 11, 1951" defendants were in plaintiff's elevator office. The parties talked about corn driers, specifically the "American All Crop Dryer" handled by Edward J. Heck & Sons Company, of Omaha, Nebraska.

Both plaintiff and his manager disclaimed any knowledge of corn driers. Plaintiff says he told defendants "I would have my man call and we would try to get one if they wanted one."

It seems defendants had seen a drier at Dysart, Iowa.

"They said they had seen * * * it hooked up to a 4000 bushel crib and it seemed like it was doing satisfactory work." Riekena says he had "a piece of literature on the desk with reference to a dryer and they talked about that."

It is not shown whether inquiry about corn driers was the original purpose of defendants' visit to plaintiff's office or merely incidental. Both plaintiff and his manager testify they do not handle farm machinery and had had no experience with corn driers.

However, it is undisputed plaintiff's manager, at defendants' request and in their presence, did at that time put in a phone call to the Heck & Sons Company at Omaha and that as a result on December 11, 1951, a salesman of that company came to plaintiff's office and met defendants there. Plaintiff was present but says he neither took part in nor heard the conversation between defendants and the Heck salesman, Sivinski. Riekena, plaintiff's manager, also disclaims having taken part in it: "* * * I went about my work. I was busy that day. The salesman was there I imagine three quarters of an hour * * *. I didn't hear their conversation."

Since the salesman, Sivinski, was not called as a witness and defendants did not testify we do not have direct evidence of the conversation. Plaintiff, however, at some stage of the transaction, apparently was consulted: "After they had completed their conversation with the salesman I asked Williams and Mr. Koch if they wanted one, and they said yes. The salesman prepared the order blank or memorandum made out in reference to the purchase of a dryer. This order blank was never presented to me, and it might have been signed by my manager."

The record shows a duplicate written order, signed: "Snittjer Grain Co. John Riekena. Authorized signature. Signed purchaser." It is dated "12-11-1951" and specifies: "Ship to Snittjer Grain Co. at Wellsburg, Iowa, Salesman Sivinski." Opposite the words "How ship" appear the words "will pick up."

Both Riekena and plaintiff refer to it as a "bill of sale" but it is on its face an *order* by plaintiff for "2 No. 25 All Crop driers, ea. 1515.00, 3030.00, less 7½% discount 2802.75." Rie-

1122

kena explains there was another potential customer present who, however, that evening "cancelled it; said he wasn't interested." That presumably explains the order for *two* machines and the subsequent delivery of but *one*. That delivery, under the record, was in substantial compliance with the written order.

The record shows payment by plaintiff to the Heck & Sons Company by two checks, one dated "12-11-51" for the $700 required down payment, the other for $701.37, dated "1-30-1952"; also an "Original Invoice" from the Heck & Sons Company, dated January 17, 1952, reciting: "Sold to Snittjer Grain Company." It bears a notation "Via picked up at factory" and list price $1515, less 7½% discount $113.63 and less down payment $700 leaving balance $701.37. It is marked "paid 1-30-52." It describes "1-Model No. 25 American All-Crop Dryer * * * $1515.00 less 7½% disc. 113.63—$1401.37. Less down payment of 12-11-51 $700.00, $701.37." There is also shown at the bottom the words: "For Resale, Sivinski."

At the close of plaintiff's evidence the trial court sustained defendants' motion to dismiss which urged insufficiency of evidence to establish the alleged contract. Plaintiff appeals.

I. It must be conceded the evidence we have already summarized was sufficient to have presented a jury issue unless, as defendants argue, it was legally overcome and nullified by plaintiff's own admissions as a witness on cross-examination. We set them out mostly in question-and-answer form for fair appraisal of their character:

"Q. And at that time it was you who was going to get it for them? A. No, it wasn't myself. Q. Who was going to get one for them? A. I was going to get it for them to help them out in other words. Q. And you did get it for them? A. They ordered it themselves. I didn't get nothing for them. Q. Who did they order from? A. From the salesman. Q. And they didn't order it from you at all? A. I just asked Williams if they wanted one and he said yes, and I said go place your order. Q. Is it your idea that they bought it from you? A. No. Q. From whom? A. Heck and Sons, through their agent. Q. So you didn't sell them the machine at all? A. No, I didn't. Q. Now then, as to this order, was it on an order blank? A. I

imagine, I don't know. I haven't seen it to this day yet. * * *

"Q. Did the defendants talk to you concerning the price of the dryer? A. Not that I know of. They might have. I don't know about that, but I don't think so. I think the salesman gave them the price if I am not mistaken; I think he did. Q. Who in your opinion was the defendants to pay, if anyone, if they did get the dryer? A. They were supposed to pay us. Q. But you weren't selling it? A. No. Q. But they were to pay you? A. They did that because we made the first payment on it, the down payment.

"The price agreed upon between me and they was $1515. They agreed with me to purchase it at that price. * * *

"I didn't hear anything that was said between the salesman and Koch and Williams. I imagine they were talking about a dryer but I don't know. It was I that asked Mr. Koch and Mr. Williams if they wanted a dryer. * * * That was after they were through talking, and the salesman came up and I asked Mr. Williams if they wanted one and I think Koch was there too; they said yes, and I said place your order the way they wanted it. After that I imagine they gave the order. * * *

"Q. Did you buy this corn dryer from Mr. Heck or the people in Crystal Lake, Illinois? A. No, I didn't, the salesman sold it to them not to me. I didn't buy anything"; and later, "Q. Is this statement correct that you paid for a corn dryer of which you had no interest? A. That's right. Q. For Koch and Williams? A. Right. Q. And you did not sell them the machine at all? A. I didn't sell it, no. The salesman sold it and he wasn't in my employ."

■ ▮ Plaintiff's "admissions" were manifestly in the nature of *conclusions* as to what constituted a "sale", a "purchase", an "order", etc. They show a mistaken concept of the meaning and effect of the language he used as related to what actually was done. Sometimes he denies having done something when he clearly means he did not personally perform the act but did it in fact through his office manager. The order was signed by his manager acting for Snittjer Grain Co., the trade name under which plaintiff conducted his business and delivery made to defendants. The payment for the dryer was made by plaintiff by

a check similarly signed by Riekena and upon an invoice reciting a sale to plaintiff.

II. Courts have frequently wrestled with the problem that faced the trial court here. An annotation found in 169 A. L. R. 798 et seq. reveals their conclusions have not been entirely harmonious. See also 32 C. J. S., Evidence, section 1040c. The ultimate problem is succinctly posed by the annotator on page 798: "The question is simply whether, or under what circumstances, a party who has made an assertion on the witness stand, found to be unfavorable to his own case, may ask that it be disregarded."

At page 805 the annotation (under IVb) treats of the question presented by the party's own conflicting testimony: "Under the older and prevailing practice, where the more favorable evidence relied on by a party to overcome the effect of his own self-injurious statement is in his own testimony, no distinction is drawn as compared with the situation where the curative evidence is from other witnesses. It is still for the trier of fact to decide the issue upon all the evidence."

This is but another way of saying a party's own conflicting testimony, like that of any other witness, is to be weighed by the trier of fact and not treated as a question of law.

The many cases cited in this annotation illustrate the variety of circumstances under which the problem has arisen. The annotator suggests one reasonable distinction to be drawn in such cases, viz., whether the party's testimony adverse to his own case is or is not in the nature of a "judicial admission."

We think that distinction must be the deciding consideration here. It is apparent plaintiff's statements that he did not buy the "dryer" from Heck & Sons Company, nor sell it to defendants, were in the nature of inaccurate legal conclusions and were not "judicial admissions." They are mere testimony, contradicted by his own and other testimony and by actual facts revealed by the evidence. They were for the jury to consider, under proper instructions, in determining the facts.

The language in some of our opinions seems to commit us to the unqualified doctrine that a party is concluded by his admissions against interest made as a witness. In Hinkson v. Mor-

rison, 47 Iowa 167, 168, we said: "It surely ought not to be claimed that the appellant should be allowed to take up the time of the court in disproving a fact that he admitted under oath as a witness." But in that case it was a *literal* fact and not one involving, or in the nature of, a legal conclusion.

In Stearns v. Chicago, R. I. & P. Ry. Co., 166 Iowa 566, 578, 579, 148 N.W. 128, 133, it is said:

"Of course plaintiff could not impeach himself; nor would his admissions out of court, shown upon the trial, conclude him. And it is equally well settled that one is not concluded by what a witness in his behalf testifies. * * * The question really is: Is plaintiff's own testimony conclusive against himself? * * *

"Of course a party is bound by statements or agreements made by his counsel; but this does not quite reach the proposition here involved. * * *

"The point here is: Is a party to a suit bound by his own testimony, *which he does not, at any time, seek to correct or change during the course of the trial?* He is bound by statements of his counsel; by admissions in pleadings not withdrawn or superseded; and it seems to us he should also be bound by his own testimony *which he nowhere attempts to change.*" (Emphasis supplied.)

Various authorities are cited from other jurisdictions, and also Markley v. Western Union Telegraph Co., 159 Iowa 557, 562, 141 N.W. 443, 446, where it is merely said: "It is true that when a fact is, *by agreement,* made a part of the records, for the purpose of the case, a different condition or state of facts cannot be shown." (Emphasis supplied.)

In the Stearns case also the testimony involved had no element of opinion or legal conclusions. It concerned a question of pure fact, viz.: Did or did not plaintiff's train stop? The opinion, even in that case, clearly implies the testimony might have been explained or changed—that it was not necessarily conclusive against the party testifying. Here, there was other testimony of plaintiff and other evidence, in the light of which the unfavorable "admissions" must be read.

In Hughes v. Greider, 194 Iowa 726, 728, 729, 190 N.W.

420, 421, the defense was based upon timely rescission of a lease on account of claimed false representations inducing defendant to execute it. As a witness defendant in effect disclaimed the very conversation in which the false representations were supposed to have been made and the making of which his witness, Beem, had already testified to. Plaintiff moved for a directed verdict but later defendant was permitted to correct his testimony, explaining he had not comprehended the question put to him.

The opinion says: "A large part of appellant's argument is devoted to the proposition that the defendant should be held to this testimony, and should not be permitted to stultify himself by the attempted corrections. Sufficient to say, the plaintiff's point is wholly untenable. The question thus raised is one of the credibility of the witness. * * * It appears from the record that the defendant is foreign-born, a native of Switzerland, whose knowledge of English does not exceed the requirements of very commonplace conversation. It was permissible for the jury to believe that he had not comprehended the questions which he had thus answered. Indeed, we are ourselves impressed, from a reading of the record, that it was a true explanation. We hold, therefore, that such evidence was in no manner conclusive upon the defendant or upon the court, and that the plaintiff was not entitled to a directed verdict because thereof."

In 32 C. J. S., Evidence, section 1040c, the text says: "It is frequently held, in general terms or in effect, that a party is bound by his own testimony, *provided it is understandingly given,*" (emphasis supplied) citing Hughes v. Greider, supra. And later, in the same section (page 1112) it is said the application of that general rule "has been said to be narrow even in jurisdictions where the principle is recognized, and it has been limited to situations in which a party's testimony amounts to such a stipulation or waiver as to have the force of a judicial admission", citing Kanopka v. Kanopka, 113 Conn. 30, 154 A. 144, 80 A. L. R. 619.

▇ Ordinarily a "judicial admission" is one made in court by a person's attorney for the purpose of being used as a substitute for the regular legal evidence of the fact at the trial. It may even be made by the party himself where he as a witness

unequivocally concedes a fact for the purposes of the trial. Kanopka v. Kanopka, supra. See also Black's Law Dictionary (Third Ed.) 61.

In the Kanopka case (at page 39 of 113 Conn., 154 A. at page 147, page 624 of 80 A. L. R.) is stated what we deem to be the correct test: "Unless it amounts to such a stipulation or waiver as to have the force of a judicial admission, the testimony of a party to a fact is ordinarily no more conclusive upon him than the evidence given by any other witness; and it is the duty of the court or jury to determine the fact, not alone from the testimony given by the party but from all the evidence in the case."

See also discussion in Kipf v. Bitner, 150 Neb. 155, 165, 33 N.W.2d 518, 523, 524. Quoting from 4 Wigmore on Evidence (Third Ed.) sections 1058, 1059, pages 20, 21, that opinion points out the difference between a "quasi admission" and a "judicial admission." The former in Wigmore's quoted language "being nothing but an item of evidence, is therefore *not in any sense final or conclusive*. The opponent, whose utterance it is, may none the less proceed with his proof in denial of its correctness; it is merely an inconsistency which discredits, in a greater or less degree, his present claim and his other evidence."

The learned author says a "judicial admission" is "a formal act, done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for the purposes of litigation that the proposition of fact alleged by the opponent is true." Further as bearing on this classification see 31 C. J. S., Evidence, section 270.

III. We think the answer to the problem here and in similar cases is to be found by first determining the nature of the admission. That is the proper function of the court. As said by the annotation already discussed (169 A. L. R. at page 800): "If a party testifies deliberately to a concrete fact, not as a matter of opinion, estimate, appearance, inference, or uncertain memory, but as a considered circumstance of the case, his adversary is entitled to hold him to it as an informal judicial admission."

This test is not in fundamental disagreement with our former holdings, with the possible exception of the language in

1128

Hinkson v. Morrison, supra (47 Iowa 167). In the Stearns case (166 Iowa 566, 579, 148 N.W. 128, 133) there is the further qualification: If the party "does not, at any time, seek to correct or change it [his admission] during the course of the trial."

In Hughes v. Greider, supra (194 Iowa 726, 190 N.W. 420) the opinion, while not using the terms "judicial admission" and "quasi admission", did in effect hold the testimony there was not a binding judicial admission but permitted the witness to correct it.

We think plaintiff's admissions here were not conclusive. The trial court might well have sustained plaintiff's motion to reopen his case after argument on defendants' motion to dismiss, in order to permit clarification of the record. But even in absence of such clarification the motion to dismiss should have been overruled and defendants required to present their defense.

While probably none of our earlier decisions is in serious conflict with our holding here, in so far as any does so conflict it is hereby overruled. Mere testimony of a party on cross-examination, unfavorable to his own cause and in contradiction of other evidence in his favor, is not ordinarily conclusive. Unless it be of such a nature or under such circumstances as to permit the court to classify it as a "judicial admission" it merely creates a conflict in the evidence to be resolved as a question of fact.

The area of "judicial admission" cannot be defined with mathematical exactness. The multiple and variable fact situations that arise in human affairs preclude the formulation of any but a general rule. The court must determine each case under its own peculiar circumstances. We are abidingly convinced the admissions here were not in that area.

The case is accordingly—Reversed.

All JUSTICES concur.