# IN THE SUPREME COURT OF IOWA

No. 14–0199

Filed June 24, 2016

**KATHRYN WINGER** and **TIMOTHY POTTS,**

Appellants,

vs.

**CM HOLDINGS, L.L.C.,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Richard G. Blane II, Judge.

Plaintiffs and defendant seek further review of court of appeals decision ordering a new trial in a wrongful-death action arising from a fatal fall from an apartment balcony. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**

Robert G. Rehkemper and Cory F. Gourley of Gourley, Rehkemper & Lindholm, P.L.C., for appellants.

Brenda K. Wallrichs of Lederer Weston Craig PLC, Cedar Rapids, and Michael A. Carmoney and Jack W. Leverenz of Carmoney Law Firm, PLLC, Des Moines, for appellee.

**WATERMAN, Justice.**

This wrongful-death action arises from a fatal fall from an apartment balcony and presents several issues on the applicability of the doctrine of negligence per se to an alleged municipal housing code violation. The thirty-two-inch high balcony railing complied with the local housing code when the apartment complex was constructed in 1968, but unless exempted under a grandfather provision, it is ten inches shorter than the current housing code allows. Before the accident, a local housing inspector cited the landlord for that code violation. The inspector reasoned that an attached plastic lattice modified the railings to eliminate grandfather status. The landlord did not appeal that finding but rather ordered the higher railings and asked for an extension of time to install them. The City of Des Moines Housing Appeal Board (HAB), without a contested hearing, found the property was in violation but granted a three-month extension to install compliant railings and suspended the $1090 fine. The plaintiffs' daughter fell over the original railing to her death three days later.

The plaintiffs filed a premises liability action alleging the thirty-two-inch railing violated the local housing code. Their expert testified the forty-two-inch railing would have prevented the accident. The district court ruled the landlord was bound by the HAB's determination that forty-two-inch railings were required and rejected the landlord's arguments that the property was grandfathered out of the current code or that the HAB's extension of time to install higher railings excused tort liability. The court instructed the jury that the landlord's violation of the housing code constituted negligence per se and limited the jury to deciding causation, comparative fault, and damages. The jury found the landlord sixty-five percent at fault, the plaintiffs' daughter thirty-five

percent at fault, and awarded combined total damages of $1,750,000 ($1,137,500 after reduction for comparative fault). In posttrial rulings, the district court concluded the doctrine of negligence per se did not apply to a local housing code and ordered a new trial. Both sides appealed, and we transferred the case to the court of appeals, which affirmed with one judge dissenting and another specially concurring. We granted the applications for further review by both sides.

For the reasons explained below, we hold that the doctrine of negligence per se applies to the violation of a municipal housing code and is not limited to statewide laws. Additionally, the district court correctly rejected the landlord's argument that the old code applied as a matter of law. The HAB's extension of time for the landlord to comply with the code merely suspended administrative penalties without excusing tort liability. The district court, however, erred by instructing the jury on the basis that the new code applied as a matter of law. The HAB's determination of a code violation does not have preclusive effect in this wrongful-death action. On remand, the parties may present evidence on whether prior modifications eliminated grandfather status. Accordingly, we vacate the decision of the court of appeals, reverse the district court's posttrial rulings, and remand this case for a new trial.

## I. Background Facts and Proceedings.

On July 23, 2011, twenty-one-year-old Shannon Potts came to the Grand Stratford Apartments in Des Moines after work to socialize with friends. She arrived at their second-floor apartment around 1:30 a.m. slightly intoxicated and watched movies with a small group. She continued drinking until about 4 a.m. when her friends hid the alcohol. Shannon asked one to talk with her privately on the balcony. They talked for about twenty minutes before her friend returned inside to get

another drink. While inside, her friend heard a scream and a crash. Shannon had gone over the railing. Her friends ran downstairs and found her unresponsive. A bystander called 911. Shannon was rushed to the hospital with a fractured neck and crushed spine and was pronounced dead there. Toxicology tests indicated she was intoxicated at the time of her fall and had marijuana and Xanax in her bloodstream.

Mark Critelli was the sole owner of the Grand Stratford Apartments until February 15, just over five months before Shannon's fatal fall. This apartment complex consists of a duplex and three larger buildings constructed in 1968. The apartments were built to comply with the 1968 housing code which required guardrails between thirty- and thirty-four inches high. Des Moines, Iowa, Municipal Code § 24-28.06 (1962). The original black iron railings are thirty-two inches high and remained in place when Shannon fell forty-three years later. In 1979, the Des Moines, Iowa, Municipal Code was amended to require guardrails of forty-two inches in height. Des Moines, Iowa, Municipal Code § 14-10(b) (1979). The 1979 Code included a grandfather provision stating that "[g]uardrails which were installed prior to the passage of this subchapter and were in conformance with the Health and Safety Housing Code then in effect may be allowed to remain if in structurally sound condition." *Id.* In 2005, the guardrail ordinance stated, "Multiple family dwellings with porches, balconies or raised floor surfaces located more than 30 inches above the floor or below grade shall have guards not less than 42 inches in height." Des Moines, Iowa, Municipal Code § 60-127(c) (2005). The grandfather provision was revised to state, "Any structure that was in compliance on the day previous to the adoption of this code will be allowed to remain." *Id.* § 60-5. The ordinance was admitted into evidence without objection.

The HAB found Critelli was a "habitual violator" of the code. All properties under his ownership were put on an accelerated inspection schedule. In 2009, Critelli attached a forty-eight-inch high white plastic lattice to the guardrails with zip ties. The lattice served as a privacy screen to shield each balcony from view. Although Critelli received numerous notices of violations regarding this property, none addressed the guardrails before February 2011.

Eddie Leedom is a city inspector assigned to the Neighborhood Inspection Unit. He inspected the Grand Stratford Apartments on February 10 and found 106 code violations, including the guardrail height, broken window screens, and a broken garbage disposal. Leedom concluded the plastic lattice was an alteration to the guardrails that triggered a duty to comply with the current forty-two-inch guardrail requirement. He spoke with the director of the HAB who agreed the thirty-two-inch guardrails were too low.

On February 15, Eric Estes and Merle Laswell formed CM Holdings with Mark Critelli to acquire a controlling ownership interest in the Grand Stratford Apartments. The property was in disrepair, and CM Holdings began renovating the apartments to increase their rental value. As part of their renovation plan, the new owners vacated two of the apartment buildings but permitted tenants to remain in the third. Estes and Laswell planned to allow tenants to move from the unrenovated building into the newly renovated buildings as upgrades were completed.

Estes received the notice of violations on February 24. The violations were not prioritized, so Estes gave the list of violations to his general contractor without identifying which violations to address first. By March 31, CM Holdings had fixed fifty-eight violations. On an

inspection on July 5, Leedom noted only six remaining violations. He imposed a $1090 fine for the guardrail-height violations. By July 13, the only remaining infraction was the height of the guardrails, and CM Holdings had ordered new forty-two-inch guardrails.

After each inspection, Leedom sent CM Holdings a notice listing the violations and the remedial action required. Each notice contained a notification of the right to appeal the inspection, stating,

> APPEALS: Under section 60-102(a)
>
> (1)    Any owner objecting to a violation cited in this Inspection Notice may file a written appeal with the Neighborhood Inspection Division requesting a hearing before the Housing Appeals Board. An appeal shall be filed within 10 days of the date of the Inspection Notice. Upon the discretion of the Neighborhood Inspection Officer for good cause shown, an untimely appeal may be accepted.
>
> . . . .
>
> At this hearing the appellant shall have the opportunity to be heard, the right to call witnesses and to be represented by counsel.

CM Holdings never appealed any of the notices of violation.

On July 13, ten days before the accident, Estes and Laswell appeared on behalf of CM Holdings at a regularly scheduled HAB meeting to request an extension of time to bring the property into compliance and to suspend the $1090 fine. CM Holdings was one of four property owners present requesting extensions at the monthly meeting, and all received extensions. Leedom and the HAB members applauded the progress CM Holdings had made on improving the properties. A board member asked if they could restrict access to the balconies until higher railings were installed, and Estes replied that he did not know. Estes explained,

> [T]he only reason they are not in compliance is because of the height. The code has changed. I mean they are all in

good shape and they are, you know they're functional. . . . [W]e have ordered all new railings for it.

Estes told the board that CM Holdings wanted to replace the decking and patio doors on the twelve units at issue at the same time, which would take fifteen days after the materials arrived. He also stated, "[The guardrails] are all in good condition. They're just not the right height." A board member replied,

> Obviously, these folks are doing what they need to do to get this taken care of, but, you know, I don't want my name associated with the kid that falls off the balcony because the railings aren't the right height.

Estes admitted the guardrail height was a health and safety issue but reminded the board that the guardrails had been at that height for forty-five years without an accident. The board granted CM Holdings until October 7 to fix the violation. Neither the board nor CM Holdings raised the issue of whether the existing guardrails were grandfathered under the housing code.

The HAB issued a notice of its decision on July 20, stating,

> The above referenced property has been found to be in violation of the Municipal Code of the City of Des Moines, Iowa. The property was not brought into compliance as ordered by the Notice of Violation issued by the Neighborhood Inspection Division. The case was referred to the Housing Appeals Board (HAB) and the Board ordered the following:
>
> The HAB granted an extension until 10-07-2011 to complete the repairs and suspended the $1,090.00 fine. However, the board also made a part of that motion that if repairs are not completed by the same date, this case will be referred to the Legal Department for prosecution. . . .

Shannon Potts fell over the balcony rail to her death three days later.

On June 19, 2012, Shannon's parents, Kathryn Winger, the executor of Shannon's estate, and Timothy Potts (the plaintiffs) filed a lawsuit on behalf of Shannon's estate and for loss of consortium. On

September 5, 2013, CM Holdings moved for summary judgment on the ground that the extension from the HAB to install higher guardrails was a legal excuse precluding tort liability. On September 26, the plaintiffs moved for partial summary judgment on the ground that the violation of the forty-two-inch guardrail requirement constituted negligence per se as a matter of law. CM Holdings resisted the plaintiffs' motion on several grounds: the HAB extension, the grandfather clause, and a legal argument that the doctrine of negligence per se does not apply to a local ordinance. The district court deferred ruling on the cross-motions for summary judgment until trial.

The jury trial began on November 4, 2013, and lasted five days. Housing inspector Leedom testified as follows regarding housing code compliance:

> Q. Safety codes periodically change over time; is that true? A. That's true.
>
> Q. Do you know when that apartment was originally built? A. No, I don't.
>
> Q. Do you know if those 32-inch guardrails complied with the building code that may have existed when the building was originally built? A. I have to assume that they did. It would have to be inspected then.
>
> Q. Now, as a general proposition, if the code changes, does that automatically mean that everybody has to go immediately update their property? A. No.
>
> Q. And, in fact, if a code changes, absent any other circumstances, does a property remain compliant so long as it was compliant with the previous code? A. Yes.
>
> Q. What circumstances can arise that require a property owner to bring an older property up into compliance with a new code? A. If a portion of that property were to be decayed, defective to the point that it has to be replaced; or if that portion of the property had been altered in any way that did not meet the code of today.
>
> Q. Explain what type of alterations trigger a requirement that a property owner bring a particular building up to compliance. A. If someone makes an addition to a piece of property or if someone takes something away from it, anything that they might do to change the way it is used and a safety factor of it.

Q. So if a particular part of a building has its use or its safety changed, then that can be one of those alterations that trigger the property owner to bring the building into compliance with the current code? A. Yes.

Q. Did that happen with respect to 531 35th Street? A. Yes.

Q. Explain that for the jury. A. The guardrails on the balconies at 531 had been altered, and the fact that they had — they'd put latticework attached to the guardrails to raise the height of the guardrail, and the extended height was nothing but latticework.

That made an alteration in the way it looked, it made an alteration in the way it was used, and it made an unsafe alteration.

Q. Explain how you felt that addition of the latticework could be unsafe for someone that would have been standing on that deck or balcony. A. Well, the additional height that was made by putting the latticework there, the latticework was not a material that would be strong enough to be used as a guardrail. It was just flimsy.

The plaintiffs introduced pictures of the latticework. The plaintiffs then questioned Leedom regarding why the latticework was an alteration.

Q. That difference in height was one of the problems that you felt required the change and the alteration of this property to be brought in compliance with the Des Moines Housing Code? A. Yes.

Leedom testified the property was in violation of the city ordinance.

Q. [T]he guardrail was at 32 inches; the latticework went up above that? A. Correct.

Q. On July 23, 2011, was CM Holdings, L.L.C., violating the law in that respect with respect to that property? A. I can say they were in violation of the city ordinance, yes.

CM Holdings cross-examined Leedom about which code provisions applied to the Grand Stratford apartments:

Q. As far as you know, all of the components of this building were in full compliance with the building and the housing codes that would have been in effect back at that time in 1968? A. Yes.

Q. Back then 32-inch guardrails would meet the code at that time? A. Probably, Yes.

Q. Housing and building codes do change over time. You talked about that? A. Yes.

Q. The height requirement for guardrails on new construction today is 42 inches in height? A. Correct.

Q. Now, you acknowledged earlier that under the law that owners of existing property are not required to bring their building up to code every time that code changes? A. That's correct.

Q. As a general rule? A. Yes.

Q. As a general rule, as long as the building is in compliance with the existing code on the day before the change takes place, then the building is deemed to be in compliance right on through; correct? A. Yes.

Q. We call that routinely grandfathered in? A. That's what it's called, yeah.

. . . .

Q. If I look at the first paragraph there [of the Des Moines Municipal Housing Code section 60-5], the very last sentence of that first paragraph, I'm just going to read it, if you could follow along and confirm I'm reading it correctly.

"Any structure that was in compliance on the day previous to the adoption of this code will be allowed to remain." Did I read it correctly? A. Yes.

Q. That's the grandfather clause; right? A. That's what it's called. That's the laymen's term, yes.

. . . .

Q. [Y]ou never indicated any specific reason for the requirement that those railings be upgraded to the current code, not in those written reports; correct? A. Just the height requirement.

Q. You indicate the height requirement but never indicated a reason why the new 42-inch requirement would be triggered? A. No.

. . . .

Q. You stated that it was the attachment of that plastic lattice to the rails themselves that you feel triggered the requirement to bring the railings up to the current code? A. Yes.

. . . .

Q. The guardrails themselves—and here I'm talking about the actual metal guardrail that provides protection for people who go on the balconies—those guardrails were never actually modified by putting the lattice in place.

It added an additional, just trying to—adding those plastic lattice pieces didn't change the guardrails themselves; right? A. It gave the perception of a higher guardrail.

Q. But it didn't actually change the physical properties of the metal rails themselves? A. No.

Q. Now, when you walk out on one of these balconies and you look at the guardrail with the lattice attached, the lattice would be on the outside of the railings; right? A. I believe it was.

. . . .

Q. The view of the actual railing is not blocked per se by the lattice? A. The view of the iron is not, no. It's not covered up.

Q. In any event, this particular issue that you found was never specifically identified on the inspection notices. You simply indicated that the new height requirement of 42 inches was in effect? A. Yes.

On redirect, the plaintiffs probed how Leedom concluded that it was an alteration.

Q. There was some discussion about your determination that the latticework was a change of use of the guardrails with [CM Holdings' counsel]. Do you recall that discussion? A. Yes.

Q. Was it the change of effect that you felt that might have on the perception of someone out there in terms of their safety that caused you to call it a change of use? A. Yes. You could see that the latticework is being broken and busted off above the original iron guardrail.

Q. And, once again, did you state that that felt to you like a false sense of security for someone that was out there with that latticework around there? A. Yes.

Q. After you made the determination that adding the latticework to the guardrail was a change of use, did you talk to anybody else about that determination? A. Yes.

Q. Who did you talk to? A. I talked to my supervisor.

Q. Who was your supervisor back in 2011? A. Jack Hanson.

Q. And what position did he hold at or for the City back in 2011? A. He agreed that it would be an alteration of the handrail—or guardrail. I'm sorry. Guardrail.

The chairman of the HAB, Richard Bason, testified about the grandfather status:

Q. [D]o you recall whether or not the railings were complaint with the Des Moines Code? A. No. That's why

[Leedom] brought them before the board. They were not in compliance from the standpoint of — as I recall, at the original time that Mr. Leedom inspected the property they were found to be — there was something added. They were changed.

And therefore, because of that, he faulted the property because of this change, whether it was a latticework or something.

Prior to that it had passed code, I believe, many times —inspection. It passed inspection. But it's not uncommon that when different inspectors go out, just because it passed the last four times doesn't mean that he didn't catch it this time.

But the case here is the fact that it was changed. The uses of it had been changed, modified. And that was, I believe, the main reason he faulted it as being then — because it was changed, it eliminated the grandfather in his mind. And, therefore, he was bringing it and saying, Okay, we got to make it to current code. That's the best I can remember on it.

The plaintiffs' expert, Richard Hinrichs, a professor at Arizona State University, testified regarding why guardrails are required to be forty-two inches high:

The International Building Code is based on—that they arrived at the 42-inch minimum height based on where the average person's center of gravity falls when standing. And I'm sure that there was originally research done in order to arrive at that height of 42 inches.

But essentially if you have a 42-inch-high guardrail, for the vast majority of people, except for the tallest individuals, that 42 inches will be above the height, the standing height, of one's center of gravity.

And if you have something that's above the center of gravity, you're less likely to fall over it than if something is below the center of gravity. There's something very important about that point that we call the center of gravity and how high it is relative to the top of the guardrail.

CM Holdings proposed a jury instruction in pretrial submissions stating that if the jury found the apartments were grandfathered out of

the guardrail requirement, it would not be negligent[1] and another proposed instruction regarding legal excuse based on the HAB's extension of time to correct the violations.[2] At trial, the plaintiffs moved for a directed verdict on liability, and CM Holdings moved for a directed verdict on two grounds: legal excuse based on the HAB extension and the grandfather provision. The district court denied CM Holdings' motion and granted the plaintiffs' motion, ruling that the failure to install forty-two-inch railings constituted negligence per se.

During the jury instruction conference, CM Holdings did not reoffer the proposed jury instructions regarding the grandfather clause or legal excuse. The court, over CM Holdings' objection, gave instruction 15, which stated,

> You are instructed that the Court has determined as a matter of law that pursuant to the Des Moines Municipal Housing Code the Defendant was required before July 23, 2011, to install guardrails that were at least 42 inches in height on the balcony of Apartment No. 9 at 531–35th Street Des Moines, Iowa.

---

[1]The proposed instruction stated,

The *Des Moines Housing Code* contains the following provision in respect to multi-family dwellings:

> Section 60-5. Scope, applicability and exceptions.
>
> Any structure that was in compliance on the day previous to the adoption of this code will be allowed to remain.
>
> If you find that the Des Moines Housing Code Sec. 60-5 applied to [the Grand Stratford Apartments] on July 23, 2011, you must find the defendant was not in violation of the Des Moines Housing Code Section 60-127, and was not negligent as alleged in part ___ of Instruction No. ____.

[2]That proposed instruction stated,

> If you find that Defendant CM Holdings had a valid extension of time issued by the City of Des Moines Housing Appeals Board to repair the guardrails that was in effect on July 23, 2011, you must find that defendant was not negligent as alleged in part ___ of Instruction No. ____.

Defendant's violation of law is negligence as to Instruction No. 16.

CM Holdings objected to this negligence per se instruction as follows:

At this point, based upon the rulings of the Court, that verdict form appears to — although Defendant disagrees with the ruling, it appears that the verdict form is set up in a manner that doesn't unfairly highlight that issue [the violation of the municipal housing code] yet again. . . .

. . . .

[W]ith regard to the verdict form and more as a general matter, Defendant does object and would urge the Court to reconsider its ruling on the legal issues regarding its finding that there was a violation of the Municipal Housing Code.

. . . .

Defendant does believe that it's an error, that it would be an error, to find that any of Defendant's conduct was negligence per se under the record presented to the Court and would object to the jury being instructed to that and would object to the verdict form that does not have a specific question in which the jury would determine whether or not Defendant was at fault.

The court overruled the objections without modifying the instruction.

Because the jury was instructed the court had already determined that CM Holdings was negligent, the special verdict directed the jury to decide the remaining issues of causation, comparative fault, and damages. The jury returned a verdict on November 13, finding the defendant's fault caused the plaintiffs' damages. The jury further found Shannon was thirty-five percent at fault and CM Holdings was sixty-five percent at fault and awarded the plaintiffs $1,750,000 before the reduction for Shannon's fault.

On December 20, CM Holdings moved for judgment notwithstanding the verdict (JNOV) and a new trial, claiming the district court erred in finding a violation of the ordinances constituted negligence

per se.[3]  On February 6, 2014, the district court granted the motion for a new trial.  The district court ruled that the ordinance, as incorporated in Iowa's Uniform Residential Landlord Tenant Act (IURLTA), Iowa Code section 562A.15 (2011), did not establish a sufficiently specific standard of care to allow plaintiffs to establish negligence per se.

Plaintiffs appealed, arguing that the district court properly found negligence per se applied during trial, and CM Holdings cross-appealed on the issues of the grandfather clause and the legal-excuse doctrine. The plaintiffs responded to the cross-appeal by arguing CM Holdings could not collaterally attack the HAB's determination that the guardrails violated the housing code.  We transferred the case to the court of appeals.  A divided court of appeals affirmed on both appeals with three separate opinions.  The majority held that our decision in *Griglione v. Martin*, 525 N.W.2d 810 (Iowa 1994), required a statewide standard for a statute or ordinance to establish negligence per se.  The majority concluded the district court correctly set aside the verdict because "compliance with an ordinance that may or may not be grandfathered does not constitute conclusive proof of reasonableness."  The concurrence concluded the IURLTA created a statewide standard that satisfied *Griglione* but that our decision in *Montgomery v. Engle*, 179 N.W.2d 478, 484 (Iowa 1970), precluded a negligence per se instruction because it held that "evidence of violation of the [housing] ordinance . . . is prima facie evidence of negligence."  The dissent argued the jury verdict should be reinstated because the ordinance set a specific

---

[3]CM Holdings also moved for remitter or new trial on grounds the damages awarded were excessive but has not pursued that argument on appeal.

standard of conduct and our cases do not require a statewide standard. The remaining issues were not addressed by the court of appeals.

Both parties applied for further review, which we granted.

## II. Standard of Review.

"The scope of our review of a district court's ruling on a motion for a new trial depends on the grounds raised in the motion." *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006) (quoting *Richards v. Anderson Erickson Dairy Co.*, 699 N.W.2d 676,678 (Iowa 2005)). The question of whether a duty exists is a question of law reviewed for correction of errors at law. *See id.* ("[I]f the motion was 'based on a legal question, our review is on error.' " (quoting *Richards*, 699 N.W.2d at 678)); *Porter v. Iowa Power & Light Co.*, 217 N.W.2d 221, 228 (Iowa 1974) ("The question of existence of duty is a matter of law for the court."). "We are slower to interfere with the grant of a new trial than with its denial." *Bryant v. Parr*, 872 N.W.2d 366, 376 (Iowa 2015) (quoting *Cowan v. Flannery*, 461 N.W.2d 155, 157 (Iowa 1990)).

"Whether the elements of issue preclusion are satisfied is a question of law." *Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012) (quoting *Grant v. Iowa Dep't of Human Servs.*, 722 N.W.2d 169, 173 (Iowa 2006)).

"We review a district court judgment on a ruling for judgment notwithstanding the verdict for corrections of errors at law." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 734 (Iowa 2009). "We examine whether substantial evidence supports each element of the claim . . . in a light most favorable to the nonmoving party." *Id.* "Evidence is substantial if a jury could reasonably infer a fact from the evidence." *Id.*

(quoting *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 391 (Iowa 2001)).

**III. Analysis.**

The central fighting issue on appeal is whether CM Holdings was negligent *as a matter of law* by failing to replace the thirty-two-inch high balcony guardrails with forty-two-inch high guardrails. We must resolve several related questions. First, CM Holdings argues—and the court of appeals ultimately concluded—that under *Griglione*, only breach of a specific statewide statute or rule can constitute negligence per se, while the breach of a local ordinance cannot. We disagree and hold that the breach of a specific safety-related requirement in a municipal ordinance with the force of law may constitute negligence per se.

Second, CM Holdings argues its property was grandfathered out of the forty-two-inch high guardrail requirement. The plaintiffs argue that CM Holdings is bound by the HAB's determination that its thirty-two-inch balcony guardrails with the attached lattice violated the code. The district court ruled that CM Holdings could not "collaterally attack" the HAB determination. We reframe the issue as one of issue preclusion and hold that the HAB finding is not preclusive in this tort action.

Third, CM Holdings contends the HAB's extension of time to install forty-two-inch railings excused its tort liability in the interim. We affirm the district court's ruling rejecting that legal excuse.

Finally, we conclude neither side was entitled to a directed verdict on the grandfather issue under the existing record. That issue must be litigated on remand.

**A. Can a Violation of a City Ordinance Constitute Negligence Per Se?** The court of appeals construed *Griglione* to hold that only the breach of a statewide standard can constitute negligence per se and

affirmed the order granting a new trial on that basis. The court of appeals understandably relied on this language from *Griglione*:

> We believe rules of conduct that establish absolute standards of care, the violation of which is negligence per se, must be ordained by a state legislative body or an administrative agency regulating on a statewide basis under authority of the legislature. That is the position espoused in Restatement (Second) of Torts § 286 (1965) and followed by this court in *Jorgensen* [*v. Horton,* 206 N.W.2d 100, 102 (Iowa 1973)]. We are persuaded that, for purposes of civil damages actions based on allegedly negligent actions by municipal employees, this principle is sound.

525 N.W.2d at 812. The plaintiffs argued that language is dicta, but the court of appeals concluded that language is controlling. We note that language was unnecessary to the decision and is not supported by the cited authorities. We resolve the issue by overruling *Griglione.*

Our court has long recognized the violation of a municipal safety ordinance can be negligence per se. *See Hedges v. Conder*, 166 N.W.2d 844, 850–51 (Iowa 1969) (holding party could be negligent per se for failing to follow city ordinance requiring use of crosswalks); *Kisling v. Thierman*, 214 Iowa 911, 915, 243 N.W. 552, 554 (1932) (adopting general rule that violation of rules of the road in statutes or ordinances constitute negligence per se); *Tobey v. Burlington, Cedar Rapids & N. Ry.*, 94 Iowa 256, 265, 62 N.W. 761, 764 (1895) (holding violation of speed limit ordinance was negligence per se). However, the district court and court of appeals questioned the viability of this line of cases based on what we recently said in *Griglione,* a case that did not involve a municipal ordinance or code with the force of law.

The fighting issue in *Griglione* was whether the violation of a local police department's internal operating procedures constituted negligence per se. Paula Blythe received threatening phone calls from Rodney Griglione, her former paramour. 525 N.W.2d at 811. She called the

Mt. Pleasant Police Department, and the responding police officer, Steven Martin, while interviewing her inside her trailer, heard someone yelling profanities outside. Officer Martin stepped outside in the dark and looked around with his flashlight. *Id.* He saw Griglione climbing over a fence with a large knife in his right hand. *Id.* Griglione ran towards Officer Martin, who drew his pistol and fired three times, fatally wounding Griglione. *Id.* at 811–12.

Griglione's widow sued Officer Martin, arguing that he was negligent per se for violating his department's operating procedures by using deadly force and failing to call for backup or identify himself as a police officer before shooting. *Id.* at 812. The preamble to the operating procedures stated,

> The following Police Department Standard Operating Procedures are guidelines that are suggested for occurrences as specified as follows. They will never replace good, sound judgment or common sense, but when confronted with an unfamiliar situation should serve as an aid to the Officer.

*Id.* The provisions regarding deadly force included the following statement:

> The Deadly Force Policy is written to guide officers before the fact in approaching a potentially critical situation and not merely to assist in assessing the possible liability after the fact. The use of deadly force in effecting an arrest shall be based on the concept of protection of the officer or other person from the use, or threat of use of deadly force.

*Id.*

We concluded that violations of the department's internal operating procedures were not negligence per se for two reasons. *Id.* First, we held that the operating procedures "do not involve the delineation of that type of precise standard required to invoke the negligence per se doctrine." *Id.* Second, we stated that only the violation of a rule applying

"statewide" could constitute negligence per se and cited *Jorgensen* and the Restatement (Second) of Torts section 286, in support of that proposition. *Id.* That statement was broader than necessary to decide the narrow issue of whether an officer's violation of his department's internal procedures is negligent per se. We could have answered "no" without addressing local ordinances that have the force of law. Moreover, the cited authorities contradict the proposition that only violations of statewide standards constitute negligence per se. In *Jorgensen*, we considered whether the defendant's failure to follow a standard in a private construction safety code was negligence per se. 206 N.W.2d at 102. We said,

> Statutes *and ordinances* such as these under discussion are a legislative prescription of a suitable precaution, or a fixing by law of the standard of care which is required under the circumstances, and it must follow that a failure to observe the standard of care thus fixed by law is negligence.

*Id.* (emphasis added) (quoting *Kisling*, 214 Iowa at 915, 243 N.W. at 554). We ultimately held breach of the private safety code did not establish negligence per se, but we noted four times in that opinion that an ordinance may serve as the basis for negligence per se. *Id.* at 102–03. Similarly, the Restatement (Second) of Torts expressly includes ordinances as a basis for a standard of care the violation of which is negligent per se. Restatement (Second) of Torts § 286, at 25 (Am. Law Inst. 1965) ("The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment . . . ."); *id.* § 286 cmt. *a* (" 'Legislative enactment' includes both statutes and ordinances."). The Restatement (Third) of Torts continues to recognize that the violation of a local ordinance is negligence per se. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 14

cmt. *a*, at 154–55 (Am. Law Inst. 2010) ("This Section most frequently applies to statutes adopted by state legislatures, but equally applies to regulations adopted by state administrative bodies, ordinances adopted by local councils, and federal statutes as well as regulations promulgated by federal agencies.").

CM Holdings and the court of appeals relied on *Montgomery* for the proposition that the violation of a municipal safety ordinance is merely evidence of negligence rather than negligence per se. 179 N.W.2d at 483–84. In *Montgomery*, we did not conclude the violation of an ordinance can never be negligence per se; rather we used a fact-specific, case-by-case approach for determining "whether the alleged ordinance violation constitutes negligence per se or merely prima facie evidence of negligence . . . . Each case has been decided in light of the purpose and intent of the statute or ordinance involved." *Id.* at 483. In *Montgomery*, the plaintiff was injured falling down a stairway that lacked a railing. *Id.* at 480–81. The city municipal code required handrails on stairway exits. *Id.* at 481. We noted "the primary purpose of these statutes appears to be protection from fire hazards." *Id.* (quoting *Lattner v. Immaculate Conception Church*, 255 Iowa 120, 129, 121 N.W.2d 639, 645 (1963)). We said that the violation of a statute is not negligence per se "unless the plaintiff [is] a member of the class the statute is designed to protect and the harm is one the enactment is designed to protect." *Id.* (quoting *Lattner*, 255 Iowa at 129, 121 N.W.2d at 645). The plaintiff was not fleeing a fire—he was walking down the stairs. *Id.* at 478–81. Accordingly, we determined that the defendants' violation of the ordinance should have been submitted to the jury with a prima facie negligence instruction rather than a negligence per se instruction. *Id.* at 484.

We now conclude the scope of the class of people protected by the municipal handrail ordinance was viewed too narrowly in *Montgomery* as persons fleeing fires, rather than a broader class of people using such stairways routinely to enter or exit the apartment. To the extent *Montgomery* is inconsistent with our opinion today, we overrule it.

In *Koll v. Manatt's Transportation Co.*, a truck driven by Michael Manatt and owned by Manatt's Transportation Company backed over David Koll, killing him. 253 N.W.2d 265, 267 (Iowa 1977). The plaintiff alleged the truck lacked equipment required by OSHA and IOSHA regulations, specifically a backup alarm audible above the surrounding noise level. *Id.* at 269. Koll's estate sued Manatt's and argued the defendant's violation of the regulation constituted negligence per se. We held that the

> violation by an employer of an OSHA or IOSHA standard is negligence per se as to his employee. Such a violation is evidence of negligence as to all persons who are likely to be exposed to injury as a result of the violation.

*Id.* at 270. Accordingly, Koll was unable to establish negligence per se against Manatt's Transportation Company because he was not Manatt's employee. *Id.*

In *Wiersgalla v. Garrett*, we reiterated the governing standard as follows:

> [I]f a statute or regulation . . . provides a rule of conduct specifically designed for the safety and protection of a certain class of persons, and a person within that class receives injuries as a proximate result of a violation of the statute or regulation, the injuries "would be actionable, as . . . negligence per se." To be actionable as such, however, "the harm for which the action is brought must be of the kind which the statute was intended to prevent; and the person injured, in order to recover, must be within the class which [the statute] was intended to protect."

486 N.W.2d 290, 292 (Iowa 1992) (citations omitted) (quoting *Koll*, 253 N.W.2d at 270). We hold this standard applies equally to municipal ordinances.

The ordinance at issue here requires forty-two-inch high guardrails on second floor or higher balconies. The obvious purpose for requiring a forty-two-inch high guardrail on balconies above ground level is to protect persons from getting killed or injured falling off the balcony. Shannon clearly was within the scope of persons intended to be protected from injury by the municipal ordinance. The requirement is sufficiently specific to prescribe a standard of care the violation of which constitutes negligence per se. *See O'Neil v. Windshire Copeland Assocs., L.P.,* 197 F. Supp. 2d 507, 510 (E.D. Va. 2002) (ruling that apartment owner was negligent per se for having balcony guardrail lower than required by city building code); *Heath v. La Mariana Apartments,* 180 P.3d 664, 669–70 (N.M. 2008) (violation of guardrail spacing requirement in ordinance would be negligence per se but for grandfather provision excusing landlord from obligation to upgrade railings to current code); *cf. Brichacek v. Hiskey,* 401 N.W.2d 44, 47 (Iowa 1987) (holding Des Moines, Iowa, Municipal Code provision that required a "working lock" lacked the requisite specificity for negligence per se); *Struve v. Payvandi,* 740 N.W.2d 436, 442–43 (Iowa Ct. App. 2007) (holding statutory requirement to maintain heating appliances in a safe and working order was not specific enough to support negligence per se theory).

CM Holdings' argument that only a violation of a statewide law can be negligent per se conflicts with Iowa's public policy encouraging local control over residential housing for public health and safety. *See generally* Iowa Code § 364.1 (permitting a city to "exercise any power and perform any function it deems appropriate to . . . preserve and improve

the peace, safety, health, welfare, comfort, and convenience of its residents"); *Star Transp. Co. v. Mason City*, 195 Iowa 930, 953, 192 N.W. 873, 882 (1923) ("When power to regulate, license, and control is vested by the legislature in city councils, there is a broad presumption in favor of the validity of the ordinance . . . ."). The legislature has specifically allowed local housing ordinances more stringent than statewide standards in the IURLTA. *See* Iowa Code § 562A.15(1)(*a*) (requiring the landlord to follow greater duties imposed by local building or housing codes that materially affect health and safety).[4]  Our legislative enactments thus tolerate local variations in housing codes. Although building codes may differ on either side of a city's boundary, buildings are in fixed locations. Building owners will not have to deal with inconsistent local codes at a single location.

We see no good reason to limit application of the negligence per se doctrine to laws of statewide application. The negligence per se doctrine also applies to local ordinances. We next address whether the district court correctly instructed the jury that CM Holdings violated the ordinance as a matter of a law.

**B. Does the Jury Instruction on Negligence Per Se Require a New Trial?**  CM Holdings argues it was entitled to a directed verdict because the grandfather provision in the ordinance applies as a matter of law to permit the thirty-two-inch guardrails, or alternatively, the HAB's extension of time to install forty-two-inch guardrails excused tort liability. The district court rejected those arguments, ruling during trial

---

[4]In *Crawford v. Yotty*, we left open the question whether "the IURLTA imposes statutory duties that are applicable to visitors of tenants." 828 N.W.2d 295, 304 (Iowa 2013), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, ___ N.W.2d ___, ___ & n.3 (Iowa 2016). We need not answer that question here because the municipal ordinance protects visitors as well as tenants using the apartment's balcony.

that CM Holdings could not "collaterally attack" the HAB's determination that it violated the guardrail-height ordinance and the extension was not a legal excuse for tort liability. The district court instructed the jury that the court had already determined CM Holdings had violated the ordinance and that violation constituted negligence per se. The district court then ordered a new trial based on its posttrial ruling that the ordinance did not support a negligence per se theory. Because we reverse that posttrial ruling above, we must decide whether it was prejudicial error to give that jury instruction. We conclude the HAB finding of a violation cannot be used by plaintiffs offensively in this tort action, and the HAB extension does not excuse tort liability. Whether the grandfather provision applies is a mixed question of law and fact to be decided on remand.

1. *Is CM Holdings bound by the HAB finding that it violated the guardrail ordinance?* "Collateral estoppel" is also known as "issue preclusion." *Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 571 (Iowa 2006). "Issue preclusion prevents parties 'from relitigating in a subsequent action issues raised and resolved in [a] previous action.' " *Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 22 (quoting *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 103 (Iowa 2011)). The doctrine serves several purposes: protecting parties from the vexation of relitigating identical issues, furthering judicial economy by reducing unnecessary litigation, and avoiding the problem of two authoritative but conflicting rulings on the same question. *Id.* We have given preclusive effect to an agency's adjudicatory decisions in subsequent court proceedings under certain circumstances. *See, e.g., City of Johnson v. Christenson*, 718 N.W.2d 290, 301–02 (Iowa 2006) (holding board of adjustment decision allowing nonconforming use had preclusive effect against city challenging land

use in subsequent district court litigation); *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206–07 (Iowa 2003) (holding industrial commissioner's approval of contested case settlement barred employee's subsequent bad-faith tort claim against his employer's insurer); *Maquoketa Cmty. Sch. Dist. v. George*, 193 N.W.2d 519, 521 (Iowa 1972) (holding a board decision on appeal from contested case that students were not residents of school district had preclusive effect in court action against parents to collect tuition). "[A]gency action may be adjudicatory if the agency determines an individual's rights, duties, and obligations created by past transactions or occurrences." *Iowa Elec. Light & Power Co. v. Lagle*, 430 N.W.2d 393, 397 (Iowa 1988).

But we have cautioned against routinely according preclusive effect to agency determinations because

> [r]esolution of a[n administrative] dispute does not require formal court-like proceedings, and informality is considered a virtue of most administrative proceedings. When, however, collateral estoppel effect is given issue determinations made in an administrative proceeding, informality becomes a problem. Judicial proceedings operate within a system where each issue resolved is subject to appellate review. Parties develop the crucial issues, introduce the important evidence, and have an independent fact finder resolve legal and evidentiary conflicts. The reviewability of this process ensures clear and careful issue resolution.
>
> Administrative proceedings are not structured with the same goals in mind as those of formal court-like proceedings, especially with regard to issue determinations.

*Id.* at 398 (quoting Rex R. Pershbacher, *Rethinking Collateral Estoppel: Limiting the Preclusive Effect of Administrative Determinations in Judicial Proceedings*, 35 Fla. L. Rev. 422, 452 (1983)). Thus, in *Chamberlain, L.L.C., v. City of Ames*, we rejected a property owner's request to apply issue preclusion against a municipality. 757 N.W.2d 644, 649–50 (Iowa 2008). The owner planned to build an apartment complex with loft space

that could be used for sleeping. *Id.* at 646. Uncertain whether the lofts would comply with the ceiling-height requirements of the Ames Housing Code, the owner sought and obtained a code interpretation from a city official allowing the proposed use. *Id.* at 646–47. After construction was completed, the fire chief determined the ceiling height violated the code, a finding upheld by the city's board of appeals. *Id.* at 647. The city issued a certificate of occupancy only after the owner barricaded the lofts. *Id.* The owner appealed to the district court, which granted summary judgment to the city. We affirmed because the city code allowed the city to override the "initial interpretation" of its employee. *Id.* at 650. Because the initial code interpretation was "not an adjudication of rights unalterable by the city," we held the owner could not use issue preclusion against the city. *Id.* at 649–50. Accordingly, we did not address the additional requirements for applying the doctrine.

CM Holdings failed to appeal the finding that its balcony railings violated the code and instead sought and obtained an extension of time to install new railings. We consider the HAB order an "adjudication of rights" for purposes of applying issue preclusion. *See id.* We next must determine whether the plaintiffs, who were not parties to the HAB proceeding, satisfied the remaining requirements to apply issue preclusion offensively against CM Holdings.[5]

---

[5]The plaintiffs cite no cases applying issue preclusion against a property owner in a civil action based on a prior agency determination of a housing code violation. An Ohio appellate court rejected the use of issue preclusion based on unappealed building code violations. *Credit Reporting Serv., Inc. v. Joseph Sylvester Constr. Co.*, No. 98 CA 30, 1999 WL 669514, at *3 (Ohio Ct. App. 1999). There, the contractor failed to appeal the building inspector's notice of violation, and the building appeal board on the owner's appeal found code violations. *Id.* at *1. The owner sued the contractor for the costs to remedy the violations, and the trial court entered summary judgment based on the agency finding of code violations. The appellate court reversed, holding that the doctrine of issue preclusion did not apply because the code violation was not "actually litigated" before the board. *Id.* at *2. The Ohio appellate court found the contractor's

The party invoking issue preclusion must establish four elements:

> (1) the issue in the present case must be identical, (2) the issue must have been raised and litigated in the prior action, (3) the issue must have been material and relevant to the disposition of the prior case, and (4) the determination of the issue in the prior action must have been essential to the resulting judgment.

*Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 22 (quoting *Soults Farms, Inc.*, 797 N.W.2d at 104). "Although offensive use of issue preclusion is allowed in Iowa[,] . . . it is more restrictively and cautiously applied than defensive issue preclusion." *Gardner*, 659 N.W.2d at 203 (quoting *Buckingham v. Fed. Land Bank Ass'n*, 398 N.W.2d 873, 876 (Iowa 1987)). Offensive issue preclusion involves two extra considerations:

> (1) whether the opposing party in the earlier action was afforded a full and fair opportunity to litigate the issues . . . , and (2) whether any other circumstances are present that would justify granting the party resisting issue preclusion occasion to relitigate the issues.

*Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 22 (quoting *Soults Farms, Inc.*, 797 N.W.2d at 104). One circumstance in which issue preclusion does not apply is when "the party sought to be precluded . . . did not have an adequate . . . incentive to obtain a full and fair adjudication in the initial action." Restatement (Second) of Judgments § 28(5)(c) (Am. Law Inst. 1982); *see Hunter v. City of Des Moines Mun. Hous. Auth.*, 742 N.W.2d 578, 585 (Iowa 2007) (applying section 28(2) of the Restatement (Second) of Judgments); *Dettmann v. Kruckenberg*, 613 N.W.2d 238, 246, 249 (Iowa 2000) (discussing and applying "incentive to litigate" requirement to affirm civil judgment giving preclusive effect to criminal conviction establishing identity of driver in fatal accident). An adequate incentive

---

"ample opportunity to litigate the issues in the notice by appealing to the Board" was not sufficient to give the violations preclusive effect in the subsequent civil litigation. *Id.* at *3.

may be lacking when only a small dollar amount is at stake in the prior proceeding. The United States Supreme Court, in the leading case on offensive issue preclusion, cautioned that the doctrine should not be applied against a defendant who "in the first action is sued for small or nominal damages [and thus] may have little incentive to defend vigorously." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S. Ct. 645, 651, 58 L. Ed. 2d 552, 561 (1979). In *Dettmann*, we quoted a leading commentator's observation "that preclusive effect is given to a judgment only if the party precluded had the opportunity and incentive to litigate the matter fully." 613 N.W.2d at 246 (quoting Allan D. Vestal, *Issue Preclusion and Criminal Prosecutions*, 65 Iowa L. Rev. 281, 340 (1980)). Thus, courts will decline to apply issue preclusion when the party to be precluded lacked an incentive to litigate in the prior proceeding. *See, e.g., Bd. of Educ. v. Gray*, 806 S.W.2d 400, 403 (Ky. Ct. App. 1991) (declining to give unemployment compensation decision preclusive effect in employee's breach of contract action because of the "minimal" amount at stake in the agency proceeding);[6] *Hadley v.*

---

[6]Other courts have upheld the offensive use of issue preclusion against a party that litigated and lost an issue in an administrative proceeding, when the amount at stake provided the incentive to litigate in the administrative forum. For example, in *Bellermann v. Fitchburg Gas & Electric Light Co.*, the Supreme Judicial Court of Massachusetts affirmed a trial court ruling applying issue preclusion against an electric utility in a civil action by its customers for damages resulting from a storm-related power outage. 18 N.E.3d 1050, 1069 (Mass. 2014). The Department of Public Utilities (DPU) had conducted a five-day adjudicatory hearing in which the utility was represented by counsel. *Id.* The DPU issued a 215-page decision with numerous findings on inadequacies in the utility's storm preparedness and imposed a $4.6 million fine while denying recovery of nearly $7 million in storm-related costs. *Id.* at 1066. The *Bellermann* court rejected the utility's argument that it lacked "an adequate incentive to dispute its purported failures before the DPU." *Id.* at 1067.

Similarly, in *United States v. Karlen*, the United States Court of Appeals for the Eighth Circuit found an adequate incentive to litigate at the agency. 645 F.2d 635, 639–40 (8th Cir. 1981) (affirming district court ruling giving preclusive effect to an agency decision). Merrill Karlen leased tribal land to graze cattle. *Id.* at 637. The Bureau of Indian Affairs (BIA) canceled his lease for excessive hay cutting and assessed

*Maxwell,* 27 P.3d 600, 603–04 (Wash. 2001) (en banc) (concluding $95 fine for traffic violation provided insufficient incentive to appeal finding of guilt or to justify use of issue preclusion in subsequent personal injury lawsuit).[7] As the Washington Supreme Court recognized, "There must be sufficient motivation for a full and vigorous litigation of the issue" in the prior proceeding. *Hadley,* 27 P.3d at 604; *see also* 18 Charles A. Wright, et al., *Federal Practice and Procedure* § 4423, at 612 (2d ed. 2002) ("The most general independent concern reflected in the limitation of issue preclusion by the full and fair opportunity requirement goes to the incentive to litigate vigorously in the first action.").

A settlement may provide another explanation for a lack of incentive to litigate in the prior proceeding. *See, e.g., Arizona v. California,* 530 U.S. 392, 414, 120 S. Ct. 2304, 2319, 147 L. Ed. 2d 374, 395 (2000) (declining to give preclusive effect to prior consent decree, noting "settlements ordinarily occasion no *issue preclusion*"); *Adam v. State,* 380 N.W.2d 716, 721 (Iowa 1986) (declining to give preclusive

_____

damages of $57,325. *Id.* Karlen requested a formal hearing. An administrative law judge (ALJ) conducted a two-day de novo hearing in which Karlen was represented by counsel. *Id.* at 637, 640. The ALJ issued a written ruling affirming cancellation of the lease but setting aside the damage award for lack of jurisdiction. *Id.* at 637. The ALJ's decision was affirmed by the Interior Board of Indian Appeals. *Id.* Karlen did not seek judicial review. *Id.* The tribe's trustee later sued Karlen for money damages, and the district court granted partial summary judgment against Karlen applying offensive issue preclusion based on the ALJ's decision terminating the lease for excessive haying. *Id.* at 638. The Eighth Circuit affirmed, noting Karlen's incentive to litigate the $57,325 damage assessment. *Id.* at 640.

[7]The Iowa Motor Vehicle Code provides that "No record of the conviction of a person for any violation of this chapter or other traffic regulations less than a felony shall be admissible as evidence in any court in any civil action." Iowa Code § 321.489 (2011). We have applied that statute to hold convictions for traffic violations resulting from a contested trial are not given res judicata effect in a subsequent civil action. *Berding v. Thada,* 243 N.W.2d 857, 859–60 (Iowa 1976). Guilty pleas, however, may come into evidence as admissions. *Id.* at 860. Guilty pleas and *Alford* pleas in which a court found a factual basis for the plea may also be given preclusive effect in subsequent civil actions. *Emp'rs Mut. Cas. Co.,* 815 N.W.2d at 23–24.

effect to a prior district court ruling on a statutory exemption when the losing party settled on appeal).

A key purpose of issue preclusion is to avoid the cost of unnecessary litigation. *Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 22. We would undermine that purpose if we gave preclusive effect to administrative decisions informally resolving alleged violations because raising the stakes preclusively would motivate parties to litigate instead of settling the agency matter. *See Salida Sch. Dist. R-32-J v. Morrison*, 732 P.2d 1160, 1165 (Colo. 1987) (en banc) (declining to give preclusive effect to unemployment compensation decision in wrongful-termination lawsuit because to do so would result in more contested, lengthy hearings causing "judicial economy [to] be frustrated, rather than improved"). We do not want to discourage informal, voluntary resolutions. *See Peak v. Adam*, 799 N.W.2d 535, 543 (Iowa 2011) ("The law favors settlement of controversies." (quoting *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (Iowa 1990))).

In our view, CM Holdings lacked an adequate incentive to litigate the grandfather issue before the HAB. At that time, it only faced a $1090 fine (not a wrongful-death lawsuit) and essentially attained a compromise settlement through the order that suspended that fine and granted its requested extension to install the new railings. CM Holding's new owners had recently acquired multiple distressed properties and had been working proactively with the city to correct numerous violations at the apartment complexes. CM Holdings had already ordered new forty-two-inch balcony guardrails for installation. It had every reason to pick its battles with the housing officials and little or no reason to challenge the finding of a violation in the very order that granted its requested extension to install the new guardrails and suspended the fine. The cost

of an administrative appeal to litigate the grandfather issue presumably would have greatly exceeded the $1090 fine.

We conclude the doctrine of offensive issue preclusion should not apply here because CM Holdings, having obtained its requested extension and suspension of the fine, lacked an adequate incentive to appeal the violation. Accordingly, we hold the district court erred by ruling that CM Holdings was bound by the HAB's finding of a violation. Because we resolve the question on this ground, we do not reach the remaining requirements for offensive use of issue preclusion.

Alternatively, the plaintiffs argue CM Holdings is bound by statements it made at the HAB meeting purportedly admitting the railing violated the ordinance:

> If a party testifies deliberately to a concrete fact, not as a matter of opinion, estimate, appearance, inference, or uncertain memory, but as a considered circumstance of the case, his [or her] adversary is entitled to hold him [or her] to it as an informal judicial admission.

*Yockey v. State,* 540 N.W.2d 418, 421 (Iowa 1995) (quoting *Snittjer Grain Co. v. Koch,* 246 Iowa 1118, 1127, 71 N.W.2d 29, 34 (1955)). Estes' statements were not made under oath and were insufficiently concrete to establish a judicial admission. Estes and Laswell did not specifically admit the guardrails violated the municipal code. *See id.* at 421 (holding that a plaintiff who "expressly conceded during her testimony" that she was not fired in retaliation "had the effect of an informal judicial admission"). Although Estes said at the HAB meeting the guardrails with the attached lattice "were just not the right height," he also noted that the "code ha[d] changed." He stopped short of saying the grandfather provision did not apply. Accordingly, the statements at the HAB meeting fall short of a judicial admission in this tort action. Nor do we equate the

equivocal statements to a guilty plea or *Alford* plea for purposes of issue preclusion under *Employers Mutual Casualty Co.*, as the plaintiffs contend. Such pleas require a judicial finding of a factual basis. *Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 24. That requirement is not met here.

2. *Was CM Holdings legally excused based on the HAB's extension?* CM Holdings moved for a directed verdict and JNOV on grounds the HAB's extension of time to allow installation of forty-two-inch guardrails excused tort liability. The district court correctly concluded the extension merely suspended enforcement of the administrative penalty and did not excuse tort liability.

"The legal excuse doctrine allows a person to avoid the consequences of a particular act or type of conduct by showing justification for acts that otherwise would be considered negligent." *Rowling v. Sims*, 732 N.W.2d 882, 885 (Iowa 2007). We have identified four categories of legal excuse:

> (1) anything that would make it impossible to comply with the statute or ordinance;
> (2) anything over which the [person] has no control which places [him or her] in a position contrary to the provisions of the statute or ordinance;
> (3) where the [person] is confronted by an emergency not of [his or her] own making, and by reason of such an emergency, [he or she] fails to obey the statute; and
> (4) where a statute specifically provides an excuse or exception.

*Hagenow v. Schmidt*, 842 N.W.2d 661, 673 (Iowa 2014), *overruled on other grounds by Alcala*, ___ N.W.2d at ___ & n.3. A jury may only be instructed on the category of legal excuse that is supported by the evidence. *See id.*

CM Holdings relies on section 60-101(3): "The housing appeals board shall . . . [r]ule on requests for additional time, provided that the

granting of such additional time does not endanger the life, health or safety of the occupants or the integrity of the structure." Des Moines, Iowa, Municipal Code § 60-101(3). An extension for time under this section does not specifically excuse the violation. A request for time is made when the HAB has determined there has been a violation of the housing code. *See id.* § 60-85(a)(2). The notice granting an extension of time explicitly states the Grand Stratford Apartments are in violation of the housing code. The suspension of a fine and extra time to complete repairs does not mean the property complies with the code during the time allowed. To the contrary, the notice states, "The property was not brought into compliance" with the code.

CM Holdings cites no case holding that an agency's extension of time to remedy code violations provides the property owner a legal excuse in a third party's tort action arising from the violation. We affirm the district court's ruling rejecting CM Holdings' legal excuse.

3. *Did the district court correctly rule the grandfather provision did not apply as a matter of law?* CM Holdings argues the forty-two-inch guardrail requirement in the current municipal code did not apply to the Grand Stratford Apartments based on the grandfather provision in the housing code. The district court rejected that argument by erroneously applying collateral estoppel based on the HAB finding[8] and did not address this issue in its posttrial ruling granting a new trial.[9]

---

[8]The district court order stated,

The Court also finds that since the Defendant did not file an appeal with the HAB, the Notice of Inspection finding that the lattice did create a change that required the guardrail to [be] updated to be in compliance with the new code height of 42 inches, cannot now be collaterally attacked by the Defendant in this lawsuit. As noted above, Defendant never followed the appeal process, never filed an appeal from the city's

The purpose of a grandfather provision for property owners is to "avoid the harsh effect of the retroactive application" of a new rule of law. *See State v. Finders*, 743 N.W.2d 546, 549 (Iowa 2008) (discussing the grandfather provision in the sex offender residency restriction law). Housing codes include grandfather provisions to avoid constitutional challenges. As the Maine Supreme Court recently observed,

> A grandfather clause, which allows the limited continuance of nonconformities, is included in zoning ordinances in order to avoid takings challenges. It is designed to strike a balance between a municipality's interest in abolishing nonconformities and the interests of property owners in maintaining land uses that were allowed when they purchased their property.

*Day v. Town of Phippsburg*, 110 A.3d 645, 649 (Me. 2015) (citation omitted).

> The grandfather provision in the Des Moines housing code states:

> The provisions of this article shall apply to the maintenance, repair, equipment, use and occupancy of all residential rental buildings and accessory structures now in existence or hereafter constructed, rehabilitated, renovated or converted to residential use within the corporate limits . . . . *Any structure that was in compliance on the day previous to the adoption of this code will be allowed to remain.*

Des Moines, Iowa, Municipal Code § 60-5 (emphasis added).

CM Holdings relies on trial testimony the thirty-two-inch balcony railings were code-compliant the day before the current ordinance was enacted in 2005 and therefore should be grandfathered. The plaintiffs

---

determination, and never challenged that it was obligated to install 42 inch guardrails on the balconies.

[9]CM Holdings argued in its motion for judgment notwithstanding the verdict that the guardrails were grandfathered in. The district court's ruling on CM Holdings' posttrial motions granted CM Holdings a new trial for instructing the jury that the violation of a city ordinance could be negligence per se and stated "it is unnecessary to address any other issues raised in Defendant's post-trial motions."

rely on trial testimony by the housing inspector and his supervisor that latticework installed on the balcony railings after 2005 created a false sense of security and triggered an obligation to upgrade the balcony guardrails to the current forty-two-inch height requirement. The district court never decided that specific issue, nor was it submitted to the jury. Under the existing trial record, neither side was entitled to a directed verdict. Although the district court correctly denied CM Holdings' motions for a directed verdict and JNOV on the grandfather provision under this record, it erred by granting the plaintiffs' motion for partial directed verdict and by instructing the jury, over defendant's objection, that the thirty-two-inch high balconies constituted negligence per se.[10] That instructional error requires a new trial on liability and damages.

---

[10]The plaintiffs contend CM Holdings waived error on the grandfather defense by failing to specifically object to the lack of a jury instruction on that issue or reoffer its own jury instruction at the instruction conference. We disagree. CM Holdings preserved error by objecting to the verdict form and Instruction No. 15 that instructed the jury the court had already determined the failure "to install guardrails that were at least 42 inches in height on the balcony" was a violation of law and was negligent. CM Holdings' objection to that instruction and verdict form invited the court to reconsider its legal ruling and reiterated its disagreement with that ruling. That ruling rejected the grandfather argument that had been briefed and argued in the motions for summary judgment and motion for directed verdict, issues that were quite familiar to the trial judge. Counsel for CM Holdings clearly articulated the perceived error in the jury instructions:

> Defendant does believe that it's an error, that it would be an error, to find that any of Defendant's conduct was negligence per se under the record presented to the Court and would object to the jury being instructed to that and would object to the verdict form that does not have a specific question in which the jury would determine whether or not Defendant was at fault.

Accordingly, CM Holdings' objection was sufficiently specific to alert the district court to the legal error in its instruction and verdict form. *See* Iowa R. Civ. P. 1.924; *Moser v. Stallings*, 387 N.W.2d 599, 604 (Iowa 1986) ("The objection must be sufficiently specific to alert the trial court to the basis of the complaint so that if error does exist the court may correct it before placing the case in the hands of the jury."). We have never required a party to offer its own jury instruction in addition to objecting to the court's instruction in order to preserve error.

*See Bryant*, 872 N.W.2d at 380 ("The general rule is that when a new trial is granted, all issues must be retried." (quoting *McElroy v. State*, 703 N.W.2d 385, 389 (Iowa 2005))); *Heath*, 180 P.3d at 670 (holding negligence per se theory is inapplicable when balcony railings may be grandfathered out of current building code). On remand, the parties may litigate the grandfather issue.

### IV. Conclusion.

For those reasons, we vacate the decision of the court of appeals and reverse the district court's posttrial rulings on the doctrine of negligence per se. We affirm the district court's ruling rejecting the legal-excuse doctrine. We remand this case for a new trial consistent with this opinion. Costs shall be assessed equally to the plaintiffs and the defendant.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**